RECORD NO. 21-4684

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

ADONIS MARQUIS PERRY,

*Defendant - Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NORFOLK

———————————

**OPENING BRIEF OF APPELLANT**

———————————

Patricia Ann René
THE RENÉ LAW FIRM
P. O. Box 6367
Williamsburg, VA 23188
757-345-1391
prene.law@gmail.com

*Counsel for Defendant - Appellant*

LANTANGE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantange Duplicating Services

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF JURISDICTION......................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................1

STATEMENT OF THE CASE............................................................2

STATEMENT OF FACTS .................................................................4

SUMMARY OF ARGUMENT   .........................................................20

LAW AND ARGUMENT ..................................................................21

I.    The district court erred in finding that Defendant was not
unlawfully seized during the traffic stop, and in refusing to
suppress the evidence obtained from the traffic stop, in violation
of the Fourth Amendment to the U.S. Constitution ................................21

Standard of Review ..................................................................21

Analysis .................................................................................21

II.    The district court erred in finding that McCarr had authority to
consent to the search of Defendant's cell phone, and in refusing
to suppress the contents of the cell phone, in violation of the
Fourth Amendment to the U.S. Constitution............................................28

Standard of Review ..................................................................28

Analysis .................................................................................28

III.    The district court erred in denying Defendant's motion to dismiss
the possession of a firearm by a felon indictment, based upon
destruction of potential exculpatory evidence...........................................38

Standard of Review ..................................................................38

i

Analysis ......................................................................38

IV.   The district court erred in overruling Defendant's Rule 29 Motion
      for Judgement of Acquittal, where the evidence was insufficient
      as a matter of law to sustain Defendant's convictions ............................42

      Standard of Review ..................................................................42

      Analysis ......................................................................42

            A.    Felon in Possession of a firearm ...............................................42

            B.    Witness Tampering and Obstruction ........................................46

            C.    Possession of Marijuana ...............................................49

V.    The Defendant's right to due process, pursuant to the Fifth
      Amendment to the U.S. Constitution was violated, where he
      received multiple punishments for the same act of attempted
      witness tampering and obstruction of justice ............................................49

      Standard of Review ..................................................................49

      Analysis ......................................................................49

VI.   The district court erred in refusing to find a conflict of interest
      existed between Defendant and his counsel, in violation of the
      Sixth Amendment to the U.S. Constitution ............................................51

      Standard of Review ..................................................................51

      Analysis ......................................................................51

VII.  The district court erred in imposing a sentence longer than
      necessary to achieve the goals of 18 U.S.C. §3553, in violation of
      Defendant's right to due process ..........................................................53

      Standard of Review ..................................................................53

      Analysis ......................................................................53

CONCLUSION ..................................................................................................55

REQUEST FOR ORAL ARGUMENT ...............................................................55

CERTIFICATE OF COMPLIANCE ....................................................................56

CERTIFICATE OF SERVICE .............................................................................57

# TABLE OF AUTHORITIES

## Cases

Alabama v. White,
  496 U.S. 325 (1990) ........................................................... 22

Arizona v. Johnson,
  555 U.S. 323 (2009) ...................................................... 22, 24

Arthur Andersen LLP v. United States,
  544 U.S. 696 (2005) ........................................................... 48

Blockburger v. United States,
  284 U.S. 299 (1932) ........................................................... 50

Brady v. Maryland,
  373 U.S. 83 (1963) ............................................................. 38

Brendlin v. California,
  551 U.S. 249 (2007) ........................................................... 22

Brown v. Ohio,
  432 U.S. 161 (1977) ........................................................... 50

Bumper v. North Carolina,
  391 U.S. 543 (1968) ........................................................... 32

California v. Hodari D.,
  499 U.S. 621 (1991) ........................................................... 22

California v. Trombetta,
  467 U.S. 479 (1984) ...................................................... 39, 41

Coolidge v. New Hampshire,
  403 U.S. 443 (1971) ........................................................... 29

Delaware v. Prouse,
  440 U.S. 648 (1979) ........................................................... 26

Dunaway v. New York,
  442 U.S. 200 (1979) ........................................................... 22

Florida v. Bostick,
    501 U.S. 429 (1991) ........................................................ 22

Florida v. Jimeno,
    500 U.S. 248 (1991) ........................................................ 37

Frazier v. Cupp,
    394 U.S. 731 (1969) ........................................................ 31

Gall v. United States,
    552 U.S. 38 (2007) .......................................................... 53

Illinois v. Caballes,
    543 U.S. 405 (2005) ........................................................ 24

Illinois v. Rodriguez,
    497 U.S. 177 (1990) ........................................................ 33

Katz v. United States,
    389 U.S. 347 (1967) .................................................. 21, 29

Maryland v. Wilson,
    519 U.S. 408 (1997) ................................................... 23-24

Mincey v. Arizona,
    437 U.S. 385 (1978) ........................................................ 29

North Carolina v. Pearce,
    395 U.S. 711 (1969) ........................................................ 50

Ornelas v. United States,
    517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) .............. 21, 28, 38, 49

Reeves v. Warden,
    346 F.2d 915 (4th Cir. 1965) .................................... 32, 34

Rehaif v. United States,
    139 S. Ct. 2191 (2019) .................................................... 42

Reid v. Georgia,
    448 U.S. 438 (1980) ........................................................ 26

Riley v. California,
    134 S. Ct. 2473 (2014) .................................................... 29

Rodriguez v. United States,
    135 S. Ct. 1609 (2015) ..................................................... 24

Schneckloth v. Bustamonte,
    412 U.S. 218 (1973) .................................................... 22, 36

Stoner v. California,
    376 U.S. 483 (1964) ......................................................... 32

Terry v. Ohio,
    392 U.S. 1 (1968) ........................................................... 22

United States v. Agurs,
    427 U.S. 97 (1976) .......................................................... 38

United States v. Baldovinos,
    434 F.3d 233 (4th Cir. 2006) ...................................... 51, 52

United States v. Beidler,
    110 F.3d 1064 (4th Cir. 1997) .......................................... 42

United States v. Bell,
    954 F.2d 232 (4th Cir. 1992) ............................................ 43

United States v. Bernard,
    708 F.3d 583 (4th Cir. 2013) ...................................... 51, 52

United States v. Black,
    707 F.3d 531 (4th Cir. 2013) ...................... 22, 25, 26, 28

United States v. Block,
    590 F.2d 535 (4th Cir. 1978) ............................. 31, 32, 34

United States v. Blue,
    957 F.2d 106 (4th Cir. 1992) ............................................ 43

United States v. Bollin,
    264 F.3d 391 (4th Cir. 2001) ............................................ 53

United States v. Booker,
    543 U.S. 220 (2005) ......................................................... 53

United States v. Brignoni-Ponce,
    422 U.S. 873 (1975) ......................................................... 26

United States v. Davis,
 332 F.3d 1163 (9th Cir. 2003) .......................................................... 33

United States v. Dean,
 414 F.3d 725 (7th Cir. 2005) ............................................................ 53

United States v. Diosdado-Star,
 630 F.3d 359 (4th Cir. 2011) ............................................................ 53

United States v. Edlind,
 887 F.3d 166 (4th Cir. 2018) ...................................................... 46, 48

United States v. Edwards,
 869 F.3d 490 (7th Cir. 2017) ............................................................ 48

United States v. Hill,
 852 F.3d 377 (4th Cir. 2017) ............................................................ 24

United States v. Johnson,
 55 F.3d 976 (4th Cir. 1995) .............................................................. 43

United States v. Johnson,
 587 F.3d 625 (4th Cir. 2009) ............................................................ 54

United States v. Jones,
 678 F.3d 293 (4th Cir. 2012) ............................................................ 26

United States v. Laughman,
 618 F.2d 1067 (4th Cir.), cert. denied, 477 U.S. 925 (1980) ............................ 43

United States v. Lochan,
 674 F.2d 960 (1st Cir. 1982) ............................................................ 43

United States v. Lynn,
 592 F.3d 572 (4th Cir. 2010) ............................................................ 54

United States v. Matlock,
 415 U.S. 164 (1974) ...................................................................... 32

United States v. Mendenhall,
 446 U.S. 544 (1980) ...................................................................... 21

United States v. Moreland,
 437 F.3d 424 (4th Cir. 2006) ............................................................ 53

United States v. Newsome,
   322 F.3d 328 (4th Cir. 2003) ............................................................. 39

United States v. Peterson,
   524 F.2d 167 (4th Cir. 1975) ........................................................ 31, 34

United States v. Reid,
   523 F.3d 310 (4th Cir. 2008) ........................................................ 42, 49

United States v. Robinson,
   60 F.3d 826 (4th Cir. 1995) ............................................................... 43

United States v. Ruiz,
   428 F.3d 877 (9th Cir. 2005) ............................................................. 33

United States v. Russell,
   221 F.3d 615 (4th Cir. 2000) ........................................................ 51, 52

United States v. Tucker,
   603 F.3d 260 (4th Cir. 2010) ............................................................. 51

United States v. Welch,
   4 F.3d 761 (9th Cir. 1993) ................................................................. 33

United States v. Williams,
   808 F.3d 238 (4th Cir. 2015) ............................................................. 23

Whren v. United States,
   517 U.S. 806 (1996) .......................................................................... 21

Winston v. Lee,
   470 U.S. 753 (1985) .......................................................................... 29

Wong Sun v. United States,
   371 U.S. 471 (1963) .................................................................... 27, 38

## Statutes

18 U.S.C. § 922 .................................................................................... 2

18 U.S.C. § 924 .................................................................................... 2

18 U.S.C. § 981 .................................................................................... 2

18 U.S.C. § 1512 ............................................................................. 2, 46

18 U.S.C. § 3553 ........................................................................ 2, 53, 54

21 U.S.C. § 844 ...................................................................................... 2

28 U.S.C. § 1291 .................................................................................... 1

28 U.S.C. § 2461 .................................................................................... 2

## Other Authorities

Fed. R. App. P. 4 .................................................................................... 1

Fed. R. App. P. 29 ............................................................................ 1, 42

U.S. Const. amend. IV ................................................. 1, 20, 21, 28, 29

U.S. Const. amend. V ...................................................................... 2, 49

U.S. Const. amend. VI ..................................................................... 2, 51

## STATEMENT OF JURISDICTION

This appeal results from final judgment of the United States District Court for the Eastern District of Virginia, Norfolk Division, in criminal cases pursuant to the Federal Rules of Appellate Procedure.  Fed. R. App. P. (4)(b).  The Court of Appeals has jurisdiction over appeals of all final judgments of the district courts of the United States, pursuant to Title 28 U.S.C. §1291.  Therefore, this Court has jurisdiction over this appeal.

On December 3, 2021, final judgment was entered in this case.  On December 8, 2021 a Notice of Appeal of this final judgment was filed timely, pursuant to Fed. R. App. P. 4(b).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.    The district court erred in finding that Defendant was not unlawfully seized during the traffic stop, and in refusing to suppress the evidence obtained from the traffic stop, in violation of the Fourth Amendment to the U.S. Constitution.

II.    The district court erred in finding that McCarr had authority to consent to the search of Defendant's cell phone, and refusing to suppress the contents of the cell phone, in violation of the Fourth Amendment to the U.S. Constitution.

III.   The district court erred in denying Defendant's motion to dismiss the possession of a firearm by a felon indictment, based upon destruction of potential exculpatory evidence.

IV.   The district court erred in overruling Defendant's Rule 29 Motion for Judgement of Acquittal, where the evidence was insufficient as a matter of law to sustain Defendant's convictions.

V.   The Defendant's right to due process, pursuant to the Fifth Amendment to the U.S. Constitution was violated, where he received multiple punishments for the same act of attempted witness tampering and obstruction of justice.

VI.   The district court erred in refusing to find a conflict of interest existed between Defendant and his counsel, in violation of the Sixth Amendment to the U.S. Constitution.

VII.  The district court erred in imposing a sentence longer than necessary to achieve the goals of 18 U.S.C. §3553, in violation of Defendant's right to due process.

## STATEMENT OF THE CASE

On October 2, 2019, the Government filed a Second Superseding Indictment, charging Adonis Marquis Perry [herein Perry] with Felon in possession of One or More Firearms, in violation of 18 U.S.C. §§922(g)(1) and 924 (a)(2); Tampering by Attempting to Influence, Delay, and Prevent Testimony, in violation of 18 U.S.C. §1512(b)(1), Tampering by Attempting to Cause Witness to Evade Legal Process, in violation of 18 U.S.C. §1512(b)(2)(C), Tampering by Attempting to Cause Summoned Witness to Be Absent From Official Proceeding, in violation of 18 U.S.C. §1512(b)(2)(D), Obstruction of Justice, in violation of 18 U.S.C. §1512(c)(2), Possession of Controlled Substance, in violation of 21 U.S.C. §844(a), and Asset Forfeiture, in violation of 18 U.S.C. §§924(d) & 981(a)(1)(C), and 28 U.S.C. §2461.

Perry moved the trial court to suppress the evidence found at the traffic stop and the contents of his cell phone.  In addition, Perry moved to dismiss the

indictment for possession of a firearm felon based upon destruction of potentially exculpatory evidence.  Perry moved to dismiss his trial counsel based upon a conflict of interest.  The motions were denied.

On June 22, 2021 through June 24, 2021, Perry was tried by a jury, which returned a verdict of guilty on all counts of the Second Superseding Indictment. Perry's motion for judgement of acquittal was denied.

On December 3, 2021, upon consideration of a presentence report and argument by counsel, the court sentenced Perry to serve concurrent terms of 120 months for count 1, 210 months for counts 2 through 5, and 2 years for count 6, for a total term of 210 months incarceration in the U.S. Bureau of Prisons.  Perry was ordered to pay a total of $600 in special assessments.  The court imposed a concurrent term of three (3) years supervised release, and certain other conditions.

On December 8, 2021, Perry timely noted this appeal.

## STATEMENT OF FACTS

The Government's evidence proved the following facts[1]:

On December 18, 2017 at about midnight, City of Norfolk Police Officers Joshua Miller [herein Miller] and Brian Para [herein Para], were traveling southbound on O'Keefe Street when a blue SUV traveling northbound passed his car (JA276-279,313,952-953). The two officers, each of whom had been police officers for about one year were working an overtime shift (JA428,436,604). Miller, the driver, noticed the SUV did not have a front license plate and the rear plate was a piece of paper with a marker on it (JA278,313,954).

Miller made a U-turn, and observed the SUV, accelerate and disregard two stop signs (JA278,313,955,959). The area is known to the officers as one of high crime and gang activity (JA279). Miller decided to catch up to the SUV to initiate a traffic stop to investigate the license plate and the traffic violations (JA279).

Miller activated his body camera [herein bodycam] as he exited the patrol car (JA280,409-410). The in-car camera or dash camera [herein dashcam], which is activated simultaneously with the patrol car's emergency lights, was also recording the stop (JA281). Perry requested several times that Miller preserve the dashcam footage, and Perry's counsel requested it, in writing, from the Commonwealth's Attorney (JA376).

---

[1] References to "(JA)" in this document are to the joint appendix filed in this case.

Miller lost sight of the SUV for approximately nine to 11 seconds from the time he made the U-turn and the stop of the SUV (JA305,419). Upon arriving behind the SUV, Miller noticed that the passenger door was open (JA282,958,969-970). Through the back windshield, Miller observed two people inside the car (JA282). One individual exited out of the driver's side and the other individual was seated in the passenger's seat, leaning towards the floorboard (JA282). At trial, Miller stated he observed the female walking from the driver's side door (JA958). Miller observed an individual come over the center console and exit the driver's side of the SUV (JA282,958). Miller identified a female, Beatrice McCarr [herein McCarr] and Perry as the occupants of the SUV, who both exited the driver's side (JA283,959).

In addition to the basis for the stop, Miller detained Perry and McCarr to investigate the movement toward the floorboard and why they both exited the driver's side (JA284-285). Miller moved Perry to the rear of the patrol car and requested Perry's identification (JA285-286). Perry provided his social security card to Miller, who ran a check for outstanding warrants through NCIC and VCIN (JA287-290). Miller told Perry he was being detained, but he was not under arrest (JA285). However, Miller placed Perry in handcuffs for officer's safety, conducted a pat-down search for weapons, and placed Perry in the back of the patrol car (JA285,293, 283-285,424-425).

5

Miller ran the check because he wanted to know who he was talking to (JA318-319). The records check did not produce outstanding warrants, however the response revealed that Perry did not have a concealed weapons permit, and cautioned of gang affiliation (JA293). Miller stated Perry had a blue bandana inside of his back pocket, which Miller associated with gang activity (JA292). Initially, Miller stated that the item was hanging outside of Perry's pocket, then admitted that it was sticking out of the pocket a little bit, which is why he asked Perry what the item was (JA316-317).

Perry stated to Miller that McCarr had tags, title, and registration for the SUV (JA286-291).

Miller did not know who was actually driving the SUV (JA288,313). Based upon Perry's statement regarding McCarr having a car title and registration, combined with seeing McCarr exit the driver's side, Miller concluded that McCarr was the driver (JA291-292). Subsequently, Perry told Miller that he was the driver and that McCarr opened the passenger door and ran around to the driver's side (JA304,599-600,965,1340). Thereafter, Perry jumped over the center console into the passenger seat (JA305,599-600,976). Miller stated that this version of facts was possible (JA305,965).

Miller stated that if McCarr was the passenger, then the guns were at her feet, not Perry's (JA340-341).

6

Para testified that he believed Perry was the driver based upon the hair styles (JA383,436).

Miller and Para determined that McCarr was the owner of the SUV upon Para immediately speaking with her (JA334-335).

Miller stated that about five minutes elapsed from the time he activated his lights upon pulling up behind the parked SUV and Para obtaining consent to search the SUV (JA294,306). Miller stated Para informed Miller that he found a gun in the vehicle within 30 seconds of obtaining consent to search (JA306-308,321).

Para told Miller that he found firearms in plain view inside of the SUV approximately six minutes into the investigation (JA295,312,334-337).

Para had moved the Glock from its original position when Miller observed it (JA321,961-962). Miller did not find the weapons but testified to what Para told him regarding where the weapons were found (JA297-298,334,961-962,970-974). Miller read Perry his rights, searched him incident to arrest and found marijuana on Perry's person (JA293,304,960,962-963,1047). Perry stated to Miller that he did not wish to talk to the officers (JA337-338).

Miller read McCarr her rights and she agreed to make a statement (JA297,1386). She was also placed in handcuffs and patted down for weapons (JA303). McCarr initially stated twice that the weapons found belonged to Perry's family (JA350). McCarr appeared scared and nervous (JA351-352). She stated

she had to get out of there and was just trying to get two blocks up the street (JA352). She wanted to get away (JA352). Miller told McCarr that if she worked with him, he would work with her (JA351). Subsequently, she stated that the weapons found belonged to Perry (JA351-352,972-973). McCarr handed the written statement to Miller (JA357). After reviewing her statement, Miller asked McCarr if she knew who the guns belonged to and McCarr stated she did not know (JA356-357). Miller stated to McCarr, "Well, the weapons, you didn't say they were his" (JA357). McCarr responded, "Oh, I did say they were his." (JA357). Miller told her to add it to her statement (JA357). Miller stated, "I believe I probably said, Well, if it's true, put it down, or something along those lines" (JA357). McCarr then added to her written statement that the guns belonged to Perry and his family (JA306,311,350,352,357). Miller did not remember whether he had a conversation with McCarr off camera before she gave the written statement (S 86-87).

Detectives C.J. Allen and Lawson spoke with McCarr off camera (JA358-359). Miller walked away, so his bodycam did not record the conversation, and the detectives were not wearing bodycams (JA358-359). Miller was not part of the conversation where McCall was shown the two guns and told the penalties for possessing them, and he was not provided the substance of that discussion (JA374-376). After McCarr's off-camera discussion with detectives and having provided

8

the written statement, McCarr was not arrested, despite the revolver having been found in her purse (JA359-360). She "worked" with law enforcement that night so they let her go (JA360). Miller informed McCarr that the paper license plate on her car was not valid (JA361). Miller handed McCarr the car key and allowed her to drive the SUV away from the scene (JA359,361-363,368-369).

Miller learned that McCarr testified to the Grand Jury under oath that she was not driving the SUV at the time of the incident (JA364). According to Miller, "She [McCarr] testified that she was actually the passenger and that she had ran around the vehicle and got into the driver's seat" (JA365).

Para testified essentially the same as Miller regarding the observations that led to the traffic stop (JA383,387). He observed McCarr coming from the driver's side of the SUV, but did not see her open the driver's door or exit (JA430-431). Perry was kneeling in the passenger seat facing the driver's door, reaching down towards the floorboard for two to four seconds (JA387-388,432). Para considered Perry's movement to be suspicious (JA433). He jumped over the center console and exited the driver's side (JA388-389).

Para placed McCarr in handcuffs, told her she was being detained, and began questioning her.

Para stated that when he moved McCarr to the front of the patrol car along the passenger side of the SUV, he saw two weapons in plain view (JA398-399).

9

Para stated he didn't see the point in seizing the guns at the time because McCarr and Perry were both in handcuffs, separated, and away from the SUV (JA392).

The trial court found that Para's assertions regarding initially seeing the weapons in plain sight were patently false and that his testimony regarding the firearms was not credible (JA444).

After Para finished questioning McCarr, he conferred with Miller, returned to McCarr and gained consent to search the SUV (JA393). Para did not notify Miller that he observed weapons in plain view when he conferred with Miller (JA405). Para requested McCarr's consent to search the SUV multiple times (JA393). Para asked McCarr whether there was anything Para needed to know about in the car, and McCarr stated that there wasn't (JA406).

Upon searching the SUV, more than five minutes into the stop, Para yelled "gun" when removing the weapon from the SUV about 25 to 30 seconds into the search, and about six minutes into the stop (394,406-407). More than three minutes passed between when Para stated he observed the weapons and notified Miller, and more than five minutes had elapsed since the stop (JA404-405,407). He stated he found a revolver in the passenger's seat, on the floorboard on top of an open bag (JA394). The butt of the revolver was sticking out of the bag, on top of stuff inside the purse (JA394,421). Miller observed the revolver on the passenger seat after Para had moved it from where it was originally located in the

SUV (JA408-409). At the time Para showed Miller the revolver, Para did not

inform Miller that Para had observed a second firearm – a Glock firearm in plain

view, and Para did not retrieve the Glock from where he observed it to show Miller

at the time he showed Miller the revolver (JA397,409-410,424). Para waited 10

minutes to notify Miller that he found the Glock (JA421).

Para requested McCarr's consent again after finding the revolver to get her

consent on bodycam, because Para had forgotten to turn it on when he exited the

patrol car, and had not actually recorded anything up until he began searching the

SUV and found the revolver (JA395-396). Approximately five minutes passed

between the time of the stop and Para obtaining consent to search the SUV

(JA397).

Upon finding the revolver, Para used his flashlight to search the rear,

driver's side floorboard of the SUV (JA411-412). There was a lot of paper,

clothes, and junk on the floorboard that Para moved around and sifted through

during a thorough search of that area, which search lasted about 42 seconds

(JA412-413). Para then used his flashlight to search the rear, passenger side

floorboard (JA414-415). He sifted through trash, a plastic bag, two-liter soda

container, and lots of garbage, similar to what he found on the rear driver's side

floorboard (JA414-415). Para stepped away momentarily, then continued his

search of that area (JA414). At about two minutes, ten seconds of sifting through the trash, Para found the Glock firearm and notified Miller (JA414,416-417).

Upon retrieving the Glock firearm, McCarr stated to Para, "That's it, that's it, I swear that's it," referring to the number of firearms present in the SUV (JA419-420). McCarr initially stated that there was nothing in the car that the officers need to know about, and did not tell Para of the presence of the Glock when Para found the revolver (JA406).

McCarr stated to Para that she was the driver of the SUV (JA433).

Officer Daniel Lee Marko [Marko], stated the dashcam will record until the traffic stop ends, the video is stored on an external hard drive, and locked securely in the trunk of the patrol car (JA558). Ultimately, the video is uploaded onto a server and automatically retained for a minimum of 30 days (JA559,561,586). To retain the video beyond that time period, the officer requesting retention has to request a supervisor to tag the video (JA559,591). A supervisor then accesses the video and tags it (JA562). The process is easy to perform (JA562).

Miller's bodycam was turned on at 10 minutes and six seconds after midnight on December 18, 2017 and it was turned off at 31 minutes 20 seconds after midnight on December 18, 2017 (JA588). Miller stated that police policy requires that the bodycam must be turned on when officers interact with anyone (JA598).

12

Miller stated he is aware of the policy on preserving dashcam video. Miller tagged and saved the bodycam video (JA602). Miller could see the presence of the dashcam video on the bodycam video when he reviewed the bodycam to tag and preserve it (JA602,606-607). He concluded that the dashcam video would not show anything different than the bodycam video (JA281-282,310,312,602). Miller did not look at the dashcam video (JA606). The bodycam video appeared to be everything Miller needed (JA602). Miller did not ask his supervisor to tag the dashcam video; although he knew he could have done so (JA602,604-05).

Detective Justin Matthews [Matthews] testified that Perry's cell phone was turned over to McCarr inside of her SUV at the end of the traffic stop when Perry was taken to jail, where he remained in custody (JA611-612). McCarr returned to Georgia with Perry's phone (JA612). McCarr used Perry's phone to receive his calls from the jail at Perry's request (JA611,616). She used it to communicate with Perry's family at Perry's request regarding his status and the status of Perry's case, including court hearings (JA611). McCarr used Perry's phone for her personal use until she was able to add minutes to her cellphone, at which point she ceased to use Perry's phone for her personal communications (JA611,617). McCarr had the password to Perry's phone (JA612). McCarr consistently referred to Perry's phone as "your" [Perry's] phone (JA627-628).

13

During a phone call that McCarr accepted from Perry on his phone, McCarr notified Perry that she was viewing pictures of the two of them on Perry's phone and Perry laughed and lodged no objection to McCarr viewing photos of the two of them (JA614-615). Matthews concluded that McCarr had primary access and control of the phone (JA615-616).

In June 2018, Matthews telephoned McCarr and requested McCarr to bring Perry's phone to Matthews when McCarr came to Norfolk for an upcoming hearing, and McCarr complied (JA616-617). Matthews knew the phone belonged to Perry when he requested it from McCarr (JA631,978). Matthews did not record the conversation(s) with McCarr regarding obtaining and searching Perry's phone (631).

On July 10, 2018, McCarr turned over Perry's phone and pass code to Matthews at the U.S. Attorney's office in Norfolk (617,977-979). She did so while under subpoena to appear before the Norfolk Grand Jury (JA633). Matthews turned on Perry's phone, put in the pass code to verify its accuracy, turned it off, fully charged the phone and attempted to get a search warrant to search the phone (JA617-618).

Matthews consulted with U.S. Attorney Jackson, prosecuting this case, and his supervisor, U.S. Attorney DePadilla regarding the necessity for a search warrant (JA628,632-633). The U.S. Attorneys agreed that Matthews should seek a

14

search warrant and Jackson set up an appointment to obtain a search warrant for

Perry's phone (JA628-629,632-633).

The magistrate denied the request for a search warrant for the phone, and

allegedly made certain statements to Matthews and the U.S. Attorneys regarding

whether a warrant was required (JA618-621,629).  During that meeting with the

magistrate, Matthews stated, "The magistrate judge denied the search warrant for

the phone, and then referenced the case of *Casella v. Borders* that was in the

Fourth Circuit Court of Appeals in which I took that affirmation confirming that

AUSA's office that we made a decision to go ahead and search the phone"

(JA621).  Matthews stated, "No, he [Magistrate Judge Leonard] didn't discuss the

case itself.  He just discussed saying to look in that case, that it may fall under our

realm of articulation for the validity of the warrant" (JA624-625).

Upon being denied the search warrant for Perry's phone, Matthews waited

about two to three days, then he took the phone to Special Agent John Dillow who

conducted the extraction of data from the phone (JA629,1052,1079-1080,1083)

The search of Perry's phone resulted in the download acquisition of Perry's

personal data stored on Perry's phone (JA1052).  Perry's personal data, obtained

by the United States included digital images and text messages (JA1052).  The

United States introduced the extracted personal data taken from the search of

Perry's phone into evidence against Perry at trial (JA1054-1059).  From the search,

Matthews obtained pictures purporting to be of Perry holding a revolver, bearing three of the serial numbers of the revolver found in McCarr's SUV; and a Glock bearing the serial numbers of the Glock recovered from McCarr's SUV (JA624-626). Matthews stated the photos were taken about two to three weeks before the stop (JA626). However, the date created for the pictures on the phone could be either when the pictures were taken with the phone, or the date the pictures were placed on the phone as a screen shot taken from a different phone (JA1061-1063).

Matthews recovered from Perry's phone two text messages to McCarr connoting Perry's ownership of a firearm, but the reference is not to any specific firearm (JA626,1086-1087).

Perry was previously convicted of felony offenses, and his right to possess a firearm has not been restored (JA929-944). Perry signed a condition of probation stating that Perry is not permitted to possess a firearm (JA946-947).

The United States introduced recorded jail calls purportedly from Perry to McCarr, in which the United States stated Perry attempted to tamper with a witness, McCarr, and obstruct justice in the prosecution of his case (JA1072-1077,1086-1103,1341-1384). McCarr did not attend the state court preliminary hearing (JA1073-1074,1076-1077).

16

McCarr told Matthews that Perry's phone belonged to Perry, not to her (JA1105). Matthews acknowledged McCarr gave him someone else's property, with the pass code and her permission to access it (1104-1105).

McCarr testified she and Perry traveled to Virginia in December 2017 so that Perry could visit his father, who was ill (JA1114-1115). She stated that both guns found at the scene of the stop belonged to Perry (JA1115-1116). She first saw the guns in Georgia a couple of months before December, but she didn't know exactly (JA1115-1116).

McCarr stated that Perry left his phone in her car when he was arrested at the scene of the stop (JA1116). Perry left his password for the phone with McCarr (JA1117). She gave Perry's phone to Matthews (JA1116). She identified Perry as the person depicted in photos obtained from Perry's phone (JA1116-1117).

McCarr stated the SUV they were traveling in belonged to her (JA1117-1118). She stated she first saw the two firearms she observed in the phone photos while in Virginia (JA1118).

At the time of the stop, the revolver was inside of McCarr's purse (JA1118,1120,1139). She stated Perry gave her the gun and told her it would keep her safe (JA1118). She got the revolver earlier the day of the stop and had been carrying it around (JA1140). She did not tell the police this information at the time of the stop (JA1141,1148-1149). The Glock was on Perry's lap.

17

McCarr stated that at the time of the stop, Perry was the driver of the SUV (JA1118,1120).  Perry instructed McCarr, who was in the passenger seat, to go to the driver's side of the SUV to act like McCarr was the driver; and, Perry was supposed to go to the passenger side (JA1118-1120,1139).  McCarr did so, leaving the passenger door open (JA1118-1121).  Perry crossed over the center console into the passenger seat (JA1120-1121).

McCarr consented to the search of the SUV (JA1121).  She made a verbal and written statement after the weapons were found, stating that Perry was in possession of the guns (JA1121-1122).  McCarr maintained contact with Perry by phone (JA1123).  She spoke to Perry by phone four or five times per day, seven days per week for three consecutive months (JA1123).

McCarr's subpoena for state court went to Perry's sister's house because that is the address McCarr wrote on her written statement as being McCarr's address (JA1125).  Therefore, she did not know she was being subpoenaed to state court between January and March of 2018 (JA1127).  Perry wanted McCarr to record her conversation with the [state] prosecutor and send it to Perry's lawyer to help Perry with his case (JA1126).  McCarr did not give Perry an affidavit or record the prosecutor (JA1126-1127).

When contacted by Matthews, McCarr lied and stated she was not McCarr and pretended to be her sister (JA1128).  Ultimately, McCarr cooperated with the

federal authorities after having discussions with her mother (JA1128-1129). Perry told McCarr that there was no case without her testimony (JA1129).

McCarr stated that earlier in the day of the stop, Perry was having a verbal altercation on the phone while she was in the car with him (JA1136). She was talking on her phone to a friend and stated she was really scared and wanted to leave Virginia (JA1135). She opened the car door, put one foot out of the car, and Perry pointed a Glock gun at her and threatened to kill her if she left (JA1135-1136).

On July 1, 2018, McCarr had been subpoenaed to the federal Grand Jury, but did not tell Perry (JA1137). McCarr appeared at the Grand Jury (JA1138). She had no further contact with Perry (JA1138).

During the jail phone calls, Perry told McCarr to tell the truth (JA1143-1144,1148). She was aware the calls were being recorded, so she did not want to say certain things (JA1145-1146). McCarr stated that she was not intoxicated at the time she gave her statements (JA1149). She consumed alcohol earlier that day (JA1149). McCarr stated in her statement, she used the term "we" to make it look like she was the driver (JA1162). She stated she was possessing the revolver at the time it was in her purse (JA1164). In her oral statement, McCarr stated the guns were Perry's family's guns (JA1164-1165).

A fingerprint recovered from the Glock did not match Perry's fingerprints

(JA1187-1188).

## SUMMARY OF ARGUMENT

I.   The district court erred in finding that Defendant was not unlawfully seized during the traffic stop, and in refusing to suppress the evidence obtained from the traffic stop, in violation of the Fourth Amendment to the U.S. Constitution.

II.   The district court erred in finding that McCarr had authority to consent to the search of Defendant's cell phone, and in refusing to suppress the contents of the cell phone, in violation of the Fourth Amendment to the U.S. Constitution.

III.   The district court erred in denying Defendant's motion to dismiss the possession of a firearm by a felon indictment, based upon destruction of potential exculpatory evidence.

IV.   The district court erred in overruling Defendant's Rule 29 Motion for Judgement of Acquittal, where the evidence was insufficient as a matter of law to sustain Defendant's convictions.

V.   The Defendant's right to due process, pursuant to the Fifth Amendment to the U.S. Constitution was violated, where he received multiple punishments for the same act of attempted witness tampering and obstruction of justice.

VI.   The district court erred in refusing to find a conflict of interest existed between Defendant and his counsel, in violation of the Sixth Amendment to the U.S. Constitution.

VII.  The district court erred in imposing a sentence longer than necessary to achieve the goals of 18 U.S.C. §3553, in violation of Defendant's right to due process.

## LAW AND ARGUMENT

I.   **The district court erred in finding that Defendant was not unlawfully seized during the traffic stop, and in refusing to suppress the evidence obtained from the traffic stop, in violation of the Fourth Amendment to the U.S. Constitution.**

### Standard of Review

A trial court's denial of a motion to suppress presents a mixed question of law and fact, reviewed *de novo* on appeal.  Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)

### Analysis

"The right of the people to be secure in their homes, persons and effects against unreasonable searches and seizures shall not be abridged."  U.S. Constitution, Amendment IV.  The Fourth Amendment protects people, not places.  Katz v. United States, 389 U.S. 347 (1967).  A person is seized within the meaning of the Fourth Amendment if, in view of all of the facts and circumstances a reasonable person would not believe that he was free to leave.  U.S. v. Mendenhall, 446 U.S. 544 (1980).

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure'" under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809 (1996).  As such, all occupants of the vehicle are seized during the duration of

the stop.  <u>Arizona v. Johnson</u>, 555 U.S. 323, 327 (2009) (quoting <u>Brendlin v.</u>

<u>California</u>, 551 U.S. 249, 255 (2007)).

Law enforcement may stop a citizen and briefly detain him to investigate

possible criminal activity.  <u>Terry v. Ohio</u>, 392 U.S. 1(1968).  However, in order to

justify a seizure, the officers must point to objectively reasonable, articulable

suspicion, based upon specific facts that the person is engaged in criminal activity.

<u>Florida v. Bostick</u>, 501 U.S. 429 (1991); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218

(1973); <u>Terry</u>.  Reasonable suspicion is dependent upon the content of information

possessed by police.  <u>Alabama v. White</u>, 496 U.S. 325, 330, (1990).

"An arrest occurs when an officer physically restrains a suspect, or in the

absence of physical restraint, the suspect submits to the officer's assertion of

authority and purpose to arrest."  <u>California v. Hodari D.</u>, 499 U.S. 621 (1991);

<u>U.S. v. Black</u>, 707 F.3d 531 (4th Cir. 2013), holding that physical touching not

required to constitute a seizure.

In <u>Dunaway v. New York</u>, 442 U.S. 200 (1979), the Court stated, "Nothing

is more clear than that the Fourth Amendment was meant to prevent wholesale

intrusions upon the personal security of our citizenry, whether these intrusions be

termed 'arrests' or 'investigatory detentions.'"

Here, Perry was seized within the meaning of the Fourth Amendment, where

officers Miller and Para stopped their patrol car behind the SUV and ordered Perry

22

and McCarr out of the vehicle. Miller immediately placed Perry in handcuffs, patted him down for weapons, and placed Perry inside of the back of the police patrol car. While Miller stated to Perry that he was not under arrest, his actions are tantamount to an arrest requiring probable cause. However, in United States v. Williams, 808 F.3d 238, 244 (4th Cir. 2015), the Court stated that a vehicle stop is "more akin to an investigative detention than a custodial arrest." Therefore, the applicable standard is that enunciated in Terry.

Even under the less stringent analysis of reasonable suspicion, Perry's detention violated the Fourth Amendment, where he was detained longer than necessary to complete the investigation of the traffic stop, and the officers' articulated basis for the prolonged detention was objectively unreasonable.

The officers' basis for the stop was to investigate the validity of the paper license plate on the SUV; the reason the SUV appeared to accelerate and failed to stop at two stop signs; and, the fact that the stop occurred late at night in a high crime area. Upon stopping the vehicle, the officers' added that Perry crossing the console and exiting through the driver's side door amounted to suspicious activity. Miller believed that McCarr was the driver and Perry was the passenger of the SUV. As such, the officers' investigation regarding the license place and probable traffic violations was limited to McCarr, not Perry. During a lawful traffic stop, officers may order passengers out of the vehicle for officer safety. Maryland v.

23

Wilson, 519 U.S. 408, 415 (1997). An officer may conduct a pat down search for weapons upon reasonable suspicion that vehicle occupants may be armed and dangerous. Arizona v. Johnson, 555 U.S. 323 (2009).

In Rodriguez v. United States, 135 S. Ct. 1609 (2015), the Court held that the permissible duration of a traffic stop, "is determined by the seizure's mission – to address the traffic violation that warranted the stop," and it may "last no longer than is necessary to effectuate that purpose." Id. at 1614. A lawful traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission" of the stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005). An officer is permitted to investigate matters unrelated to the reasons for the stop as long as it "[does] not lengthen the roadside detention" . . . "even for a *de minimus* period of time." Rodriguez, at 1614.

Here, the officers were justified in stopping the vehicle to investigate the traffic infractions and license plate. While the officers could request Perry's identification and run a records check for officer safety (See United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017), officer safety was not at issue, where Perry was handcuffed in the back of the patrol car. Essentially, placing Perry in this position, removed the necessity to perform such a check. Therefore, running such a check deviated from the purpose of the stop.

The moment the officers requested McCarr's consent to conduct a search of the car, the officers prolonged the stop as it applied to Perry, which is objectively unreasonably. The officers cannot articulate any facts that are objectively reasonable to justify the continued detention of Perry in order to obtain McCarr's consent to search the car or to conduct the actual search.

The mere fact of the time and location of the stop is not an objectively reasonable basis to detain Perry. In U.S. v. Black, 707 F.3d 531, 542 (4th Cir. 2013), the Court stated that being in a high crime area late at night is a product of one's social economic status than criminality. Otherwise, under the trial court's rationale, every citizen who resides in a high crime area surrenders their Forth Amendment protections merely by their economic disadvantage; and, that somehow citizens who live in the suburbs have more rights and constitutional protections than that of their underprivileged fellow citizens. The sheer notion that a certain segment of our society is more suspect of criminality than others because of where they can afford to live is ludicrous and is not a reasonable basis to suspect the underprivileged of criminality *per se*. As such, the time and location of the stop is not a basis for Perry's detention.

The officer's need to investigate why Perry crossed the center console and exited the driver's side is not an objective basis to prolong the detention for investigatory purposes. Merely, because such conduct is subjectively suspicious to

25

the officer is not a basis for further detention of Perry.  Indeed, there could be any number of reasons why Perry did so.  The rash of police shootings of black males could readily have caused Perry to feel safer exiting behind McCarr, rather than exiting away from her on the passenger side.  Afterall, the police took a very aggressive stance based upon a suspected traffic violation, where they hurriedly exited their vehicles, weapons drawn, shouting commands, with Para's weapon trained on the open passenger door.  Where particular conduct is, on its face, lawful or at least susceptible to a legitimate explanation, the Fourth Amendment requires the presence of additional factors that, under the totality of the circumstances, objectively point to legal wrongdoing.  United States v. Brignoni-Ponce, 422 U.S. 873, 95 (1975).

"[I]f the officer's suspicion amounts merely to an 'inchoate and unparticularized suspicion or 'hunch[,]' . . . [it] is simply too slender a reed to support the seizure' under the [F]ourth and [F]ourteenth [A]mendments of the United States Constitution."  Reid v. Georgia, 448 U.S. 438, 441 (1980); Delaware v. Prouse, 440 U.S. 648, 663 (1979).  (See also, U.S. v. Jones, 678 F.3d 293 (4th Cir. 2012), reversed for misuse of innocent facts to support a stop; Accord,  U.S. v. Black, 707 F.3d 531 (4th Cir. 2013), supra.)  Here, the fact that Perry's actions were suspicious to Miller, lacks the specificity requirement to justify the seizure.

It should not be missed that Para lied regarding the basis for the detention beyond the traffic stop. He stated he found weapons in plain view and communicated that lie to Miller. Any action Miller took based thereon does not provide a basis for the detention.

Perry, as a passenger, was detained from the inception of the stop for the entire duration of the stop. No objective, reasonable facts were articulated with specificity to justify his prolonged detention. As a result, all evidence derived from the stop, including the two weapons, ammunition, marijuana, Perry's status as a felon and lack of concealed weapons permit, and his statements must be suppressed as the fruits of the poisonous tree. Wong Sun v. United States, 371 U.S. 471 (1963).

Miller based many of his actions on Para's false statements as relayed to Miller. Therefore, Miller's articulated basis for the stop is perilously intertwined with Para's false statements to Miller and observations, which undermines Miller's articulation for the basis for the stop. Therefore, the evidence supporting the detention is tainted and unreliable. Miller stated he is unsure who was the driver. To that extent, Miller is not able to articulate a reasonable basis for Perry's detention. If, in fact, Perry was the driver, he would have standing to object to the search of the SUV, and the entire analysis of the reasonable suspicion for the stop would be different. Para and Miller each had no more than one year experience as

a police officer at the time of the stop.  Therefore, the Court cannot rely upon their

experience in the field interpreting what was occurring.

While Miller stated to Perry he was not under arrest, his actions, rather than

his statements control.  Perry was effectively under arrest from the time Miller

placed his hands on Perry, handcuffed him, and put him in the back of the patrol

car.  Miller's actions required probable cause, rather than mere reasonable

suspicion.  U.S. v. Black, 707 F.3d 531 (4th Cir. 2013).  Because the officers did

not have a reasonable suspicion for an investigatory detention, surely they did not

have probable cause to arrest Perry at the time they placed him in handcuffs and

into the back of the patrol car.

**II.      The district court erred in finding that McCarr had authority to
         consent to the search of Defendant's cell phone, and in refusing to
         suppress the contents of the cell phone, in violation of the Fourth
         Amendment to the U.S. Constitution.**

Standard of Review

A trial court's denial of a motion to suppress presents a mixed question of

law and fact, reviewed *de novo* on appeal.  Ornelas v. United States, 517 U.S. 690,

116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)

Analysis

"The right of the people to be secure in their homes, persons and effects

against unreasonable searches and seizures shall not be abridged."  U.S.

28

Constitution, Amendment IV.  The Fourth Amendment protects people, not places.

Katz v. United States, 389 U.S. 347 (1967).

"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978), quoting Katz v. United States, 389 U.S. 347, 357 (1967); Coolidge v. New Hampshire, 403 U. S. 443, (1971).  In Winston v. Lee, 470 U.S. 753 (1985), the Court stated, "The Fourth Amendment's command that searches be 'reasonable' requires that when the State seeks to intrude upon an area in which our society recognizes a significantly heightened privacy interest, a more substantial justification is required to make the search 'reasonable.'" Id.

In Riley v. California, 134 S. Ct. 2473, 2495 (2014), the Court recognized that a person has a reasonable expectation of privacy in their cell phone, holding that the search of a modern cell phone – like the search of a home – must be conducted pursuant to a warrant unless one of the well-established exceptions to the warrant requirement applies.

Here, Perry placed his cell phone with McCarr, his girlfriend, at the time of his arrest to keep for him during his incarceration.  McCarr always referred to the phone as belonging to Perry.  Perry gave McCarr specific instructions for the use

29

of Perry's phone while McCarr kept it for Perry. Perry instructed McCarr to use

his phone instead of McCarr's phone to accept his calls from the jail. He

instructed her to keep his phone with her at all times, including to keep it in the car

with her, presumable so she would not miss his calls. Perry instructed McCarr to

use his phone to send text messages back and forth between Perry and his family.

He instructed McCarr to make voice calls to his family on his behalf with voice

messages to and from his family. Perry permitted McCarr to use his phone for her

personal calls and text messages, presumably because she did not have usage time

on her own phone. McCarr stated that once she obtained usage ability on her own

phone, she stopped using Perry's phone for her personal calls and text messages.

Perry instructed McCarr to hold on to his phone for safe keeping until he was

released from jail. McCarr used Perry's phone as instructed.

Months later, Matthews learned from McCarr that she was in physical

possession of Perry's phone. During a series of unrecorded telephone

conversations between Matthews and McCarr, Matthews requested that McCarr

bring Perry's phone to him when she arrived in Norfolk from Georgia to testify at

the Grand Jury in July 2018. McCarr agreed, stating she no longer had any use for

Perry's phone. McCarr was under a witness subpoena at that time. Matthews did

not inform McCarr that she had the right to refuse to turn over Perry's phone to

him. He did not inform her she had the right to ask Perry for consent to give his

30

phone to Matthews. Even though Matthews knew of Perry's location at the jail, and that Perry was the owner of the cell phone, Matthews did not request consent to search the phone from Perry – the owner of the phone. Matthews has no recorded or written evidence of his request for consent to search the phone or McCarr granting consent.

Because Matthews did not obtain consent from Perry, and apparently did not believe McCarr had the authority to consent, Matthews applied for a search warrant for the phone. The warrant request was denied. According to Matthews, during his discussion with the magistrate for the search warrant, the magistrate cited to an unpublished per curium opinion and suggested to Matthews that he did not need a warrant if he had consent from McCarr to conduct the search. Several days later, Matthews facilitated a forensic search of the phone and obtained the contents of the data on the phone, including photos of Perry purportedly holding two firearms, and certain text messages. The photos and text messages were put in evidence against Perry to support his convictions for felon in possession of a firearm, obstruction of justice, and multiple counts of witness tampering.

Consent to conduct a warrantless search, in appropriate circumstances, may be given by a person other than the victim of the search. Frazier v. Cupp, 394 U.S. 731 (1969); U.S. v. Block, 590 F.2d 535 (4th Cir. 1978); United States v. Peterson, 524 F.2d 167 (4th Cir. 1975). To be effective, it must be freely and voluntarily

given, <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968), and the third person must have authority to give it.  <u>Stoner v. California</u>, 376 U.S. 483 (1964); <u>Reeves v. Warden</u>, 346 F.2d 915 (4th Cir. 1965).

In <u>U.S. v. Block</u>, 590 F.2d 535 (4th Cir. 1978), the Court stated, "[I]t is well settled that [consent] may be based simply upon the fact that the third person shares with the absent target of the search a common authority over, general access to, or mutual use of the place or object sought to be inspected under circumstances that make it reasonable to believe that the third person has the right to permit the inspection in his own right and that the absent target has assumed the risk that the third person may grant this permission to others."  <u>Id</u>. at 540, quoting <u>United States v. Matlock</u>, 415 U.S. 164 (1974).

However, "[I]t is equally well settled that third person consent, no matter how voluntarily and unambiguously given, cannot validate a warrantless search when the circumstances provide no basis for a reasonable belief that shared or exclusive authority to permit inspection exists in the third person from any source (<u>Stoner</u> at 489), or even more certainly, when the circumstances manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person.  <u>Reeves v. Warden</u>, 346 F.2d 915 (4th Cir. 1965).  <u>Block</u> at 590.

A third party's consent to the search of another's belongings is valid if the consenting party has either actual or apparent authority to give consent.  U.S. v. Ruiz, 428 F.3d 877 (9th Cir. 2005), quoting, United States v. Davis, 332 F.3d 1163, 1169 (9th Cir. 2003).  "A third party has actual authority to consent to a search of a container if the owner of the container has expressly authorized the third party to give consent or if the third party has mutual use of the container and joint access or control over the container." Id.  However, apparent authority is measured by an objective standard of reasonableness, and requires an examination of the actual consent as well as the surrounding circumstances.  Ruiz at 881.  In Ruiz, the Court stated, "Even when the invitation [to search] is accompanied by an explicit assertion that the person [has authority], the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." Ruiz at 881, quoting Illinois v. Rodriguez, 497 U.S. 177, 188 (1990).  The Court stated that the apparent authority doctrine applies only to reasonable mistakes of fact, not to mistakes of law.  Ruiz at 881, quoting United States v. Welch, 4 F.3d 761, 764-65 (9th Cir.1993).

The trial court found that Matthews had actual consent to conduct the search of the phone.  That finding is erroneous.

In Block, the Court distinguished between a situation where a mother had authority to consent to the search of a room in her own home that her son, the

target of the search, occupied as a member of the household in common with other children (U. S. v. Peterson, 524 F.2d 167 (4th Cir. 1975)), versus a situation where a mother, who had general access to her son's room in a home in which they both lived as guests had no authority to consent to a search therein of a bureau drawer set aside exclusively for the son's use, although she exercised some measure of shared access with him to the bureau drawer as well.  Reeves v. Warden, 346 F.2d 915 (4th Cir. 1965).

Drawing upon this distinction, in Block, the Court found that while Block was a mere guest occupant of the room in his mother's house, as head of household she had authority to consent to inspection of Block's room.  However, her authority did not extend to the search of Block's footlocker inside of his room.  Id. at 541. The Court stated, "While authority to consent to search of a general area must obviously extend to most objects in plain view within the area, it cannot be thought automatically to extend to the interiors of every discrete enclosed space capable of search within the area.  Id. at 541.

Contrary to the trial court's finding here, McCarr did not have actual authority to consent to the search of Perry's phone.  She was not the owner of the phone, unlike the mother who owned the house where the son was a guest.  Rather, Perry was the owner, and McCarr was the guest user of Perry's phone.  There is no evidence that the phone was in McCarr's name; that her name was on any account

34

associated with the phone; that she paid the phone bill; or that she could change the pass code to lock out Perry. Therefore, Perry, the owner of the phone did not surrender his expectation of privacy in the ownership of his phone merely because he permitted McCarr to have limited use of his property. Perry the owner of the phone, did not expressly authorized McCarr, a third party, to give consent to search his property. McCarr did not maintain mutual use of the phone, or have joint access or control over Perry's phone. McCarr had limited use of the phone as directed and controlled by Perry. McCarr seemingly acknowledges this fact, repeatedly referring to the phone as the property of Perry and using the phone as he directed. In fact, McCarr had a phone of her own. When she finally was able to put minutes on her own phone, she ceased to use Perry's phone at all.

Likewise, McCarr did not have apparent authority to consent to the search of Perry's phone. Matthews cannot possible claim he was mistaken regarding McCarr's authority to consent to the search of Perry's phone. He knew where Perry was located and could have confirmed whether McCarr had authority to consent. He had listened to the jail phone calls in which he heard Perry's express statements to McCarr regarding her authorization to use the phone. The fact that he applied for a search warrant is ample proof that Matthews knew he did not have valid consent to search Perry's phone. Therefore, Matthews cannot rely upon apparent authority to conduct the search. The trial court found so correctly, by

finding that Matthews had actual, rather than apparent authority. to conduct the search. Implicit in that finding is that Matthews did not have apparent authority to search.

Moreover, even if the Court finds that McCarr had the actual authority to consent to the search as the trial court found, there is no evidence she had the actual authority to consent to a search of the folders and files inside of Perry's phone, where the pictures and text messages would have been found. No evidence was presented that the pictures and text messages were on the home page or phone screen upon unlocking the phone. Therefore, it can be inferred that the pictures were in the photos folder and the text messages were in the messages folder inside of the phone. Like in the case of Reeves, the Government must establish consent to search not only the phone, but the individual compartments within the phone. The Government failed to establish such consent.

The Government failed to establish that McCarr's consent to the search was freely and voluntarily given. Consent is invalid if the consenting party's "will has been overborne and [her] capacity for self-determination critically impaired." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). The Court looks to the totality of circumstances to determine whether the consent is voluntary, and the government bears the burden of proving voluntary consent by a preponderance of the evidence. Id.

36

McCarr attempted to evade Matthews by avoiding his calls, pretending to be her sister, and not providing her actual address for the witness subpoena, among other tactics. When Matthews finally was able to speak with McCarr, he had to convince her to "cooperate" with Perry's prosecution. The calls were unrecorded and it's unknown the number of calls Matthews made to McCarr to secure her cooperation. Matthews made it clear to McCarr the penalties for failure to appear for the Grand Jury, or testify truthfully. In these same phone calls, Matthews requested that McCarr bring Perry's phone with her to the Grand Jury. McCarr did not testify to the nature of the calls with Matthews or that her consent was freely and voluntarily given. Knowledge of the right to refuse consent is a factor the courts consider in determining this issue. Matthews presented no signed documents in which McCarr acknowledged her right to refuse consent and freely and voluntarily waived such right of refusal. The trial court in its factual findings acknowledged as much. Therefore, the Government failed to show the voluntariness of any consent given.

"The touchstone of the Fourth Amendment," however, "is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). Thus, consent is relevant only insofar as it renders a search "reasonable." Id. The warrantless search of Perry's phone upon being denied a search warrant to do so, under the guise of McCarr's consent, is unreasonable as a matter of law. Therefore, all evidence derived from

the warrantless search, including photos, text messages, and meta data must be

suppressed as the fruits of the poisonous tree.  Wong Sun v. United States, 371

U.S. 471 (1963).

**III.    The district court erred in denying Defendant's motion to dismiss the possession of a firearm by a felon indictment, based upon destruction of potential exculpatory evidence.**

Standard of Review

Challenges to denial of Constitutional rights present a mixed question of law

and fact, reviewed *de novo* on appeal.  Ornelas v. United States, 517 U.S. 690, 116

S.Ct. 1657, 134 L.Ed.2d 911 (1996)

Analysis

The Due Process Clause of the Fifth and Fourteenth Amendments

requires the State to disclose to criminal defendants favorable evidence that is

material either to guilt or to punishment.  United States v. Agurs, 427 U. S. 97

(1976); Brady v. Maryland, 373 U. S. 83 (1963).  A defendant has a

constitutionally protected privilege to request and obtain from the prosecution

evidence that is either material to the guilt of the defendant or relevant to the

punishment to be imposed.  Brady v. Maryland, 373 U.S. at 87.  Even in the

absence of a specific request, the prosecution has a constitutional duty to turn over

exculpatory evidence that would raise a reasonable doubt about the defendant's

guilt.  Agurs, at 112.

Here, Perry maintains that the officers' failure to preserve the dashcam video deprived him of his right to present exculpatory evidence regarding the details of the traffic stop.

In California v. Trombetta, 467 U.S. 479 (1984), the Court held that the destruction of evidence deprives a defendant of due process of law if: (1) the evidence was potentially exculpable; (2) the exculpatory value of the evidence was apparent before the evidence was destroyed; (3) the evidence was destroyed in bad faith; and (4) no comparable evidence could be obtained by other reasonably available means. Id.; U.S. v. Newsome, 322 F.3d 328, 334 (4th Cir. 2003).

The dashcam video was potentially exculpable. The issue of who was the driver of the SUV is relevant to the question of who may have possessed the firearms on the night of the incident. Miller is not sure who was the driver. Para's lack of credibility lends no support to this determination. While the officers wore bodycams, Para did not activate his camera until well into the traffic stop. Miller activated his bodycam as he exited his vehicle. However, because both Perry and McCarr exited the driver's side of the car, and McCarr has made contradictory statements regarding who was the driver, there is insufficient evidence without the dashcam to address this question. The firearms were found in the area of the passenger area. One weapon was found in McCarr's purse on the floorboard, and the other was found underneath the passenger seat. Therefore, were McCarr seated

39

in the passenger seat, the weapons were found at her feet. Such evidence would be exculpatory in determining the issue of possession of the firearms.

Also, the evidence is equivocal regarding Perry's presence in the passenger seat and if so what were his activities. Perry was either seated in the passenger seat, reaching down toward the floorboard; or, Perry had his knees in the passenger seat, facing the driver's seat; or Perry was the driver. All of these officer observations cannot be true. The dashcam video would have answered these questions and aided Perry in his defense.

The exculpatory value of the evidence was apparent before the evidence was destroyed. At the scene, McCarr indicated she was the driver. At the magistrate's office, Perry told Miller that he was the driver. He requested that Miller preserve the dashcam so that he could prove that fact. Miller promised to preserve the video, but failed to do so. He wrote his reports, indicating that McCarr was the driver. Because Miller received conflicting reports regarding who was the driver, Miller knew or should have known that if the dashcam showed that Perry was the driver, such evidence would tend to suggest that McCarr not Perry possessed the firearms. More importantly, Perry stated as much to Miller in the event Miller was not aware of the exculpatory nature of the evidence.

The evidence was destroyed in bad faith. Perry made the request multiple times. Miller had only to request that his supervisor tag the evidence in order to

preserve it. Miller, while stating he was familiar with the police policies regarding

preservation of evidence, he did not consider preservation of dashcam footage to

be important. He stated he has never requested that his supervisor tag and preserve

evidence in a case. Moreover, Miller stated that he did not need to preserve the

dashcam because his bodycam captured the event. However, he admitted he did

not view the entire dashcam. Therefore, he has no way of knowing what the dash

cam captured to determine whether his bodycam captured the entire event.

No comparable evidence can be obtained by other reasonable means. The

witnesses have made contradictory statements regarding who was driving and

doesn't know. Miller's bodycam was not in a fixed position like the dash cam.

Rather, the movement of the camera with Miller's movement fails to capture what

was occurring inside of the SUV at the time of the stop.

A defendant has the right to present a complete defense. That right cannot

be realized where a defendant is deprived of potentially exculpatory evidence.

California v. Trombetta, 467 U.S. 479 (1984).

IV.  **The district court erred in overruling Defendant's Rule 29 Motion for Judgement of Acquittal, where the evidence was insufficient as a matter of law to sustain Defendant's convictions.**

<u>Standard of Review</u>

A Rule 29 motion for judgement of acquittal is reviewed *de novo* on appeal.

<u>United States v. Reid</u>, 523 F.3d 310 (4th Cir. 2008).   The verdict will be sustained

if supported by substantial evidence.  <u>Id</u>.  <u>United States v. Beidler</u>, 110 F.3d 1064,

1067 (4th Cir. 1997).

<u>Analysis</u>

Perry's convictions are unsupported by the evidence.  While firearms were

found in the SUV in which Perry was either the driver or the passenger, the

evidence fails to prove that he was in possession of the items.  Also, he did not

attempt to tamper with McCarr or prevent her from testifying.  Because McCarr

appeared and testified at the Grand Jury and trial, Perry did not obstruct justice.  As

a result, the evidence is insufficient to support the convictions.

A. <u>Felon in Possession of a firearm</u>.

It shall be unlawful for a person previously convicted of a felony to possess

a firearm.  <u>Rehaif v. United States</u>,  _ U.S. _, 139 S. Ct. 2191 (2019).  To sustain a

conviction, the Government must show that the defendant knew he possessed a

firearm and he knew he had the relevant status [convicted felon] when he

possessed it.  <u>Id</u>.  Knowing possession may be established by proving that the

defendant was in actual or constructive possession of a firearm.  United States v. Blue, 957 F.2d 106, 107 (4th Cir.1992); United States v. Johnson, 55 F.3d 976 (4th Cir. 1995).   Constructive possession exists when the defendant exercises, or has the power to exercise, dominion and control over the item, and has knowledge of the item's presence.  United States v. Laughman, 618 F.2d 1067, 1077 (4th Cir.), cert. denied, 447 U.S. 925 (1980); United States v. Robinson, 60 F.3d 826 (4th Cir. 1995); United States v. Bell, 954 F.2d 232, 235 (4th Cir. 1992).  Knowledge may be inferred from possession, that is, dominion and control over the area where the contraband is found.  United States v. Lochan, 674 F.2d 960, 966 (1st Cir. 1982). Possession need not be exclusive, but may be shared by others, and is susceptible of proof by circumstantial as well as direct evidence.  Laughman, 618 F.2d at 1077.

Here, the evidence found at the scene fails to show Perry was in actual or constructive possession of the firearms found in the SUV.  Para lied regarding finding the firearms in plain view.  Miller saw the firearms after Para had moved them from wherever he found them.  The revolver was found inside of McCarr's purse.  Para searched the driver and passenger rear floorboard, sifting through piles of garbage before retrieving the Glock from underneath the passenger seat from the back seat area.  Even though Para used a flashlight to aid in his search, Para did not

detect the Glock upon his initial search of that area. He stepped away, resumed his search, and found the weapon.

McCarr admitted the revolver was inside of her purse. However, she stated Perry gave it to her. She told the officers that it was the only gun in the car. When the officers found the Glock, she stated there were no other guns in the car. Her statement shows she was aware of the presence of the revolver, and lied to police regarding the presence of the Glock. Upon questioning, she initially stated, she did not know who owned the guns. Next, she stated the guns belonged to Perry's family. When confronted with the fact that she could be arrested, she stated the guns belonged to Perry. She stated Perry gave her the gun found in her purse for her safety and that Perry had the Glock on his lap prior to the stop.

McCarr owned the SUV. She stated she was the driver at the scene and signed a sworn statement to that effect. At the Grand Jury, she stated that Perry was the driver. Perry told officers after he was arrested that he was the driver. Miller stated he did not know who was the driver. However, he believed McCarr was the driver and asserted as much throughout his investigation, reports, and testimony.

Here, no evidence at the scene proves Perry was in actual possession of either firearm. The evidence fails to prove constructive possession, because the evidence fails to show that Perry was aware of the presence of the firearms in the

44

SUV or that he exercised dominion and control over the items. By contrast, the evidence shows McCarr was aware of the presence of both weapons and as the owner of the SUV she exercised dominion and control over her vehicle, as well as her purse, in which the revolver was found. The evidence shows McCarr had actual possession of the revolver and constructive possession of the Glock. Because the evidence is equivocal regarding whether Perry was driving, it is insufficient to show he exercised dominion and control over the SUV or the items found inside. Even if he exercised dominion and control over the vehicle as the driver, no evidence was presented that he was aware of the presence of the Glock, which was not in plain view.

The Government is aware that the evidence is insufficient to prove Perry possessed the weapons. Therefore, the Government attempted to prove Perry's guilt by introducing photos from his phone of Perry purporting to hold firearms. However, it is unknown when or how the photos were placed on Perry's phone. The Government showed the meta data from the pictures to show that they were put on the phone within a month of the stop. However, the evidence showed the photos could have been screenshot and put on the phone at any time.

Therefore, there is no substantial credible evidence that Perry possessed firearms.

B. <u>Witness Tampering and Obstruction</u>

Perry was convicted of multiple counts of witness tampering and one count of obstruction of justice under 18 U.S.C. §1512. The statute and its subparts essentially prohibit a person from knowingly using intimidation, threats, or corrupt persuasion or engage in misleading conduct toward another, with the intent to influence, delay, or prevent the testimony of that person in an official proceeding. <u>United States v. Edlind</u>, 887 F.3d 166 (4th Cir. 2018); 18 U.S.C. § 1512(b)(1). Under subsection (b)(2)(C), Perry is convicted of attempting to cause McCarr to evade legal process. Under subsection (b)(2)(D), Perry is convicted of attempting to cause McCarr, a summoned witness, to be absent from official proceedings. Finally, under subsection (C)(2), Perry is convicted of obstruction of justice.

These offenses essentially amount to the same conduct. However, there is not substantial evidence to support any of these counts. McCarr told officers at the scene of the stop initially that she was the driver, didn't know who owned the guns, and the guns belonged to Perry's family. Upon the realization that she could be arrested because the revolver was found in her purse and the Glock was concealed in her car, she changed her statement and ultimately stated that the guns belonged to Perry. At the Grand Jury she changed her statement regarding who was the driver.

Perry believing McCarr's statements to police, attempted to convince her to correct her false statements and to tell the truth. In a series of jail phone calls, Perry asked McCarr to tell the truth. He asked her to correct her false statements, have it notarized and sent to his trial attorney. He asked McCarr to tell the truth to the state prosecutor and to record their call in case the prosecutor threatened McCarr with prosecution. Perry never told McCarr to lie. On the contrary, he told her to tell the truth. He told her to testify truthfully or she could be charged with perjury. He told her that she could invoke her Fifth Amendment right against self-incrimination, rather than testify falsely. Perry advised McCarr to seek legal advice from an attorney multiple times. As such, Perry's intent was to convince McCarr to recant her false statements to police and to testify truthfully. He even told her to let the court know that she was being pressured to give false testimony were that the case.

By contrast, McCarr made it clear that she had no intention of appearing at any hearings or testifying in this case. She avoided Matthews' phone calls and pretended to be her sister to avoid contact with him from the outset. Matthews had to track McCarr down through McCarr's mother. McCarr provided police a false address at the scene, and did not correct that falsehood in order to avoid a subpoena. She can be heard on the jail calls, cursing Matthews and emphatically stating she did not want to talk to him, was not attending any hearings, or testify in

47

court. It is clear from the jail calls that McCarr is acting on her on volition and is not being influenced by Perry. McCarr was acting under the belief that she got away from the scene by implicating Perry, and she believed Matthews was trying to set her up. McCarr believed Matthews was trying to lure her into Virginia in order to arrest her. Therefore, McCarr had her own motivation for avoiding legal process and refusing to appear at hearings.

McCarr was taking advice from her uncle, sister, mother, friends, and other family members according to the jail phone calls. However, after Matthews made McCarr aware that her lack of cooperation with him could cause her to be jailed, she accepted the subpoena, gave Matthews Perry's phone, changed her statements given at the scene, and appeared at Grand Jury and trial.

The Government mush show that Perry's intent was corrupt and for a bad purpose. It is the corrupt intent that separates criminal and innocent acts of influence. Edlind, 887 F.3d 166 (4th Cir. 2018), quoting, United States v. Edwards, 869 F.3d 490, 498-99 (7th Cir. 2017). "[P]ersuasion," the Supreme Court has explained, is by itself "innocuous" and "not inherently malign." Id., quoting, Arthur Andersen, LLP v. United States, 544 U.S. 696, 703-04 (2005). "To be criminal, the persuasion must be corrupt and extend to 'persons conscious of wrongdoing', that is, persons acting with 'wrongful, immoral, depraved, or evil' intent. Id. at 705-06, finding that "corruptly" is synonymous with "wrongfully".

48

Therefore, there is not substantial credible evidence to support the tampering and obstruction charges.  United States v. Reid, 523 F.3d 310 (4th Cir. 2008).

C. Possession of Marijuana

Incident to arrest, Miller retrieved what appeared to be a cigar from Perry's pocket. At trial, the Government introduced a lab report that an item received from police, was marijuana.  However, the chain of custody failed to show that the item tested was the item retrieved from Perry.  Therefore, there is not substantial evidence to support the conviction.  United States v. Reid, 523 F.3d 310 (4th Cir. 2008).

**V.     The Defendant's right to due process, pursuant to the Fifth Amendment to the U.S. Constitution was violated, where he received multiple punishments for the same act of attempted witness tampering and obstruction of justice.**

Standard of Review

Challenges to denial of Constitutional rights present a mixed question of law and fact, reviewed *de novo* on appeal.  Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)

Analysis

The Double Jeopardy Clause of the Fifth and Fourteenth Amendments, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."   It has long been understood that separate statutory

49

crimes need not be identical either in constituent elements or in actual proof in order to be the same within the meaning of the constitutional prohibition. Blockburger v. United States, 284 U.S. 299 (1932).

The Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. Brown v. Ohio, 432 U.S. 161 (1977). The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and, against multiple punishments for the same offense." Id., quoting, North Carolina v. Pearce, 395 U.S. 711, 717 (1969).

Here, Perry was convicted of multiple counts of witness tampering and one count of obstruction of justice. Essentially, the offenses amount to the same act – Perry allegedly attempting to dissuade McCarr from being a witness against him at trial. While the sentences for these offenses are concurrent, still Perry suffered multiple felony convictions and concurrent punishments for the same act. Therefore, the convictions violate double jeopardy and must be reversed.

VI.   **The district court erred in refusing to find a conflict of interest existed between Defendant and his counsel, in violation of the Sixth Amendment to the U.S. Constitution.**

Standard of Review

Appellate Court's review de novo a criminal defendant's claim that his Sixth Amendment right to effective assistance of counsel was violated.  United States v. Tucker, 603 F.3d 260, 262 (4th Cir.2010).

Analysis

An appellate court may address an ineffective assistance claim on direct appeal only if the lawyer's ineffectiveness conclusively appears from the record. United States v. Bernard, 708 F.3d 583 (4th Cir., 2013); United States v. Baldovinos, 434 F.3d 233, 239 (4th Cir.2006); United States v. Russell, 221 F.3d 615, 619 n. 5 (4th Cir. 2000).

Here, Perry objected to representation by trial counsel, Trevor Robinson [herein Robinson].  Perry alleged a conflict existed between he and Robinson. Perry was initially charged in state court for felon in possession of a firearm.  The state court appointed Robinson to represent Perry.  Robinson filed a motion to withdraw from representation based upon a personal conflict with Perry, in which it was alleged that Perry issued a threat against Robinson.  The trial court granted the motion, relieved Robinson and appointed other counsel.  After the preliminary

51

hearing in state court, the Government indicted Robinson for the current charges and the state charge was terminated.

Perry was represented by five attorneys prior to the trial court appointing Robinson to represent Perry. The attorneys were granted leave to withdraw after they alleged that Perry issued threats against them. The trial court granted leave to withdraw to those counsel. However, the court refused to relieve Robinson for the same reason it relieved the other attorneys. Rather, the court appointed an additional attorney to represent Perry along with Robinson. Perry objected, citing to the conflict with Robinson and Robinson essentially agreeing to the existence of a conflict by withdrawing from the state prosecution.

Here, even though Perry was represented by an additional attorney, his right to the effective assistance of counsel was violated because his additional attorney only assisted him with part of his representation, as the two attorneys divided up the work and the questioning of witnesses during the trial. As such, Perry was denied the right to be represented by effective counsel, free of any conflict. United States v. Bernard, 708 F.3d 583 (4th Cir., 2013); United States v. Baldovinos, 434 F.3d 233, 239 (4th Cir. 2006); United States v. Russell, 221 F.3d 615, 619 n. 5 (4th Cir. 2000).

**VII.  The district court erred in imposing a sentence longer than necessary to achieve the goals of 18 U.S.C. §3553, in violation of Defendant's right to due process.**

<u>Standard of Review</u>

Appellate Courts review sentences for procedural and substantive reasonableness under an abuse of discretion standard, reversible for plain error. <u>Gall v. United States</u>, 552 U.S. 38 (2007).   However, the district court's factual findings underlying sentencing enhancements are reviewed for clear error.  The district court's legal interpretations are reviewed de novo.   <u>United States v. Bollin</u>, 264 F.3d 391 (4th Cir. 2001).

<u>Analysis</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Court held that the federal Sentencing Guidelines were advisory and required district courts to engage in a multi-step process in arriving at a sentence.  In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Court held that the district court must first correctly determine the proper guidelines range, upon making appropriate findings of fact.  <u>United States v. Diosdado-Star</u>, 630 F.3d 359 (4th Cir. 2011), quoting <u>United States v. Moreland</u>, 437 F.3d 424 (4th Cir. 2006).  Where facts are in dispute, the court is required to hold an evidentiary hearing to determine the facts.  <u>United States v. Lavell Dean</u>, 414 F.3d 725 (7th Cir. 2005).  If the sentence is determined to be procedurally reasonable based upon calculating the appropriate guidelines range, the district

court must consider certain factors, pursuant to 18 U.S.C. §3553, to determine whether the guidelines range is substantively reasonable.  Id.  The district court may adjust the guidelines range upward or downward as appropriate to support the purpose of those factors, or for any other reason the court finds appropriate under the facts and circumstances of each case.  Id.  The district court must sufficiently explain the selected sentence.  United States v. Lynn, 592 F.3d 572 (4th Cir. 2010); United States v. Johnson, 587 F.3d 625, 639 (4th Cir. 2009.).

Here, the court sentenced Perry to 210 months of incarceration.  Such a sentence was longer than necessary to achieve the goals of §3553.  The sentencing range was 168 months to 210 months.  Perry requested a sentence at or below the low end of the range.  A sentence of 168 months or lower would achieve the sentencing goals of punishment.  As the court pointed out, the case started with a single count for the firearm charge with a maximum sentence of 10 years or 120 months.  Even though additional charges were added, the facts of the case remain the same.  Therefore, if the court was prepared to sentence Perry to no more than 10 years, there is nothing about the case that changed to warrant 17 and a half years.  Merely, because the Government had to put on a case, because Perry exercised his constitutional right to trial is not a basis to tack on an additional seven and a half years to the sentence.  He should not be punished for doing so.

Also, to say that Perry has had a difficult life would be an understatement. From early on in his childhood he faced challenges. Evidence of his life struggles are contained within the presentence report. This evidence serves to mitigate against imposing the harshest sentence available, where the court had a lesser punitive alternative such as the 14-year sentence at the low end of the guidelines range or the 10-year maximum on the weapons charge. Therefore, the court violated Perry's right to substantive due process by imposing a sentence longer than necessary to achieve the sentencing goals.

## <u>CONCLUSION</u>

For the foregoing reasons, Adonis Marquis Perry prays that this court reverse his convictions and dismiss the indictments against him.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Perry respectfully requests that oral argument be granted in this case.

Respectfully Submitted this 11th day of July, 2022.

*/s/Patricia A. René*
Patricia A. René, Esq.
Virginia Bar No. 38300
Counsel for Appellant Adonis Marquis Perry

55

## <u>CERTIFICATE OF COMPLIANCE</u>

1.   This Opening Brief of Appellant has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2.   Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Opening Brief of Appellant contains <u>12,834 </u>words.

3.   I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.

<em>/s/Patricia A. René</em><br>Patricia A. René, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on July 11, 2022, I electronically filed the foregoing Opening Brief of Appellant with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

I further certify that all counsel has the Digital Exhibits and that on July 11, 2022, I served the Joint Appendix Sealed Volume IV, via USPS, on counsel listed below:

William B. Jackson
OFFICE OF THE UNITEDSTATES ATTORNEY
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510

Joseph Attias
OFFICE OF THE UNITED STATES ATTORNEY
Eastern District of Virginia
919 East Main Street, Suite 1900
Richmond, VA 23219

*/s/Patricia A. René*
Patricia A. René, Esq.