IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

No. 21-4684

───────────────

UNITED STATES OF AMERICA,

*Appellee,*

v.

ADONIS MARQUIS PERRY,

*Appellant.*

───────────────

Appeal from the United States District Court
for the Eastern District of Virginia
at Norfolk
*The Honorable Rebecca Beach Smith, Senior District Judge*

───────────────

BRIEF OF THE UNITED STATES

───────────────

Jessica D. Aber                     William B. Jackson
United States Attorney          Joseph E. DePadilla
                                            Assistant United States Attorneys
                                            101 West Main Street, Suite 8000
                                            Norfolk, Virginia 23510
                                            (757) 441-6331

*Attorneys for the United States of America*

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................1

Issues Presented ......................................................................................2

Statement of the Case ..............................................................................3

    A.    The Traffic Stop ......................................................................3

    B.    Pretrial Proceedings.................................................................12

    C.    The Defendant's Disruptive Behavior ..................................15

    D.    The Trial ..................................................................................16

    E.    The Defendant's Sentencing ..................................................17

Summary of Argument ............................................................................19

Argument..................................................................................................21

I.    The officers had reasonable suspicion to detain the defendant for the duration of the stop. ..........................................................................21

II.    The HTC phone was lawfully searched.........................................29

III.    The officers did not act in bad faith in failing to preserve the dashcam footage, which was neither exculpatory nor irreplaceable. ...........................42

IV.    Substantial evidence supported the jury's verdict. ........................46

V.    The convictions for witness tampering and obstruction do not violate principles of double jeopardy. .........................................................49

VI.    The defendant's previous violent threat against his attorney did not create a conflict of interest requiring that attorney's withdrawal.................51

i

VII.   The defendant's within-guidelines sentence is substantively reasonable. ............................................................................53

Conclusion ................................................................................54

Statement Regarding Oral Argument ....................................55

Certificate of Compliance .......................................................56

Certificate of Service ...............................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Supreme Court Decisions**

*Arizona v. Youngblood*,
  488 U.S. 51 (1988) ......................................................... 43

*Byrd v. United States*,
  138 S. Ct. 1518 (2018) ................................................... 30

*California v. Trombetta*,
  467 U.S. 479 (1984) ....................................................... 43

*Cavazos v. Smith*,
  565 U.S. 1 (2011) ........................................................... 47

*Chapman v. California*,
  386 U.S. 18 (1967) ................................................... 29, 42

*Davis v. United States*,
  564 U.S. 229 (2011) ....................................................... 40

*Fernandez v. California*,
  571 U.S. 292 (2014) ....................................................... 36

*Glasser v. United States*,
  315 U.S. 60 (1942) ......................................................... 47

*Illinois v. Wardlow*,
  528 U.S. 119 (2000) ................................................... 24, 27

*Neder v. United States*,
  527 U.S. 1 (1999) ........................................................... 42

*Ornelas v. United States,*
  517 U.S. 690 (1996) ....................................................... 22

*Rakas v. Illinois*,
  439 U.S. 128 (1978) ................................................... 29, 40

## TABLE OF AUTHORITIES, cont.

**Page(s)**

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) ............................................ 15

*Rodriguez v. United States,*
  135 S. Ct. 1609 (2015) ............................................ 22

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973) ............................................ 38-39

*Strickland v. Washington*,
  466 U.S. 668 (1984) ............................................ 52

*United States v. Arvizu*,
  534 U.S. 266 (2002) ............................................ 23

*United States v. Matlock*,
  415 U.S. 164 (1974) ............................................ 33-34

*United States v. Olano*,
  507 U.S. 725 (1993) ............................................ 50

*United States v. Peltier*,
  422 U.S. 531 (1975) ............................................ 40

**Fourth Circuit Decisions**

*Casella v. Borders*,
  404 F. App'x 800 (4th Cir. 2010) ...................... 12, 31-32, 40

*Jean v. Collins*,
  221 F.3d 656 (4th Cir. 2000) ...................... 44-45

*Trulock v. Freeh*,
  275 F.3d 391 (4th Cir. 2001) ...................... 35

*United States v. Allen*,
  27 F. App'x 168 (4th Cir. 2001) ...................... 44

iv

# TABLE OF AUTHORITIES, cont.

**Page(s)**

*United States v. Azua-Rinconada,*
914 F.3d 319 (4th Cir. 2019) ............................................................ 38

*United States v. Barronette,*
46 F.4th 177 (4th Cir. 2022) ............................................................ 54

*United States v. Block,*
590 F.2d 535 (4th Cir. 1978) ............................................................ 36

*United States v. Brandon,*
298 F.3d 307 (4th Cir. 2002) ............................................................ 43

*United States v. Buckner,*
473 F.3d 551 (4th Cir. 2007) ...................................................... 34, 37

*United States v. Bullard,*
645 F.3d 237 (4th Cir. 2011) ............................................................ 30

*United States v. Bumpers,*
705 F.3d 168 (4th Cir. 2013) ............................................................ 23

*United States v. Burfoot,*
899 F.3d 326 (4th Cir. 2018) ............................................................ 48

*United States v. Burgos,*
94 F.3d 849 (4th Cir. 1996) ............................................................ 47

*United States v. Burns,*
990 F.2d 1426 (4th Cir. 1993) ...................................................... 21, 52

*United States v. Castellanos,*
716 F.3d 828 (4th Cir. 2013) ............................................................ 30

*United States v. Davis,*
690 F.3d 226 (4th Cir. 2012) ............................................................ 30

*United States v. Elston,*
479 F.3d 314 (4th Cir. 2007) ............................................................ 27

v

## TABLE OF AUTHORITIES, cont.

**Page(s)**

*United States v. Gallo*,
   846 F.2d 74, 1998 WL 46293 (4th Cir. 1988) ........................................... 32-33

*United States v. Gearhart*,
   326 F.2d 412 (4th Cir. 1964) ................................................................... 38

*United States v. George*,
   732 F.3d 296 (4th Cir. 2013) ................................................................... 24

*United States v. Giddins*,
   858 F.3d 870 (4th Cir. 2017) ................................................................... 25

*United States v. Hill*,
   849 F.3d 195 (4th Cir. 2017) ............................................................... 28, 36

*United States v. Hill*,
   852 F.3d 377 (4th Cir. 2017) ....................................................... 22, 26, 28-29

*United States v. Holmes*,
   670 F.3d 586 (4th Cir. 2012) ................................................................. 39-40

*United States v. Jarvis*,
   7 F.3d 404 (4th Cir. 1993) ...................................................................... 49

*United States v. Jeffery*,
   631 F.3d 669 (4th Cir. 2011) ................................................................... 54

*United States v. Johnson*,
   219 F.3d 349 (4th Cir. 2000) ................................................................... 50

*United States v. Jordan*,
   952 F.3d 160 (4th Cir. 2020) ............................................................... 21, 29

*United States v. Lattimore*,
   87 F.3d 647 (4th Cir. 1996) .................................................................... 39

# TABLE OF AUTHORITIES, cont.

**Page(s)**

*United States v. Lender*,
  985 F.2d 151 (4th Cir. 1993) ........................................................... 24

*United States v. Louthian*,
  756 F.3d 295 (4th Cir. 2014) ........................................................... 47

*United States v. Matthews*,
  373 F. App'x 386 (4th Cir. 2010) ..................................................... 45

*United States v. McKenzie-Gude*,
  671 F.3d 452 (4th Cir. 2011) ........................................................... 40

*United States v. McLamb*,
  880 F.3d 685 (4th Cir. 2018) ........................................................... 41

*United States v. Miller*,
  41 F.4th 302 (4th Cir. 2022) ............................................................ 49

*United States v. Myers*,
  986 F.3d 453 (4th Cir. 2021) ........................................................... 25

*United States v. Neal*,
  458 F. App'x 246 (4th Cir. 2011) ..................................................... 51

*United States v. Palmer*,
  820 F.3d 640 (4th Cir. 2016) ........................................................... 22

*United States v. Pelton*,
  835 F.2d 1067 (4th Cir. 1987) ......................................................... 39

*United States v. Perez*,
  30 F.4th 369 (4th Cir. 2022) ............................................................ 22

*United States v. Robinson*,
  846 F.3d 694 (4th Cir. 2017) ........................................................... 26

# TABLE OF AUTHORITIES, cont.

**Page(s)**

*United States v. Smith*,
704 F.2d 723 (4th Cir. 1983) ........................................................ 27

*United States v. Stephens*,
764 F.3d 327 (4th Cir. 2014) ........................................................ 40

*United States v. Studifin*,
240 F.3d 415 (4th Cir. 2001) ........................................................ 50

*United States v. Susi*,
674 F.3d 278 (4th Cir. 2012) ................................................... 53-54

*United States v. Van Metre*,
150 F.3d 339 (4th Cir. 1998) ........................................................ 42

*United States v. Varner*,
261 F. App'x 510 (4th Cir. 2008) ................................................. 46

*United States v. Vinson*,
852 F.3d 333 (4th Cir. 2017) ........................................................ 53

*United States v. Williams*,
808 F.3d 238 (4th Cir. 2015) ........................................................ 21

*United States v. Woolfolk*,
399 F.3d 590 (4th Cir. 2005) ........................................................ 43

*United States v. Young*,
916 F.3d 368 (4th Cir. 2019) ........................................................ 44

## Federal Appeals Court Decisions

*United States v. Brodie*,
403 F.3d 123 (3d Cir. 2005) .......................................................... 47

*United States v. Douglas*,
408 F.3d 922 (7th Cir. 2005) ......................................................... 48

# TABLE OF AUTHORITIES, cont.

**Page(s)**

*United States v. Gardner*,
887 F.3d 780 (6th Cir. 2018) ........................................................... 35, 39

*United States v. Katzin*,
769 F.3d 163 (3d Cir. 2014) ........................................................... 40-41

*United States v. McAllister*,
31 F. App'x 859 (6th Cir. 2002) ...................................................... 28

*United States v. Thomas*,
818 F.3d 1230 (11th Cir. 2016) ....................................................... 35

*United States v. Tracey*,
597 F.3d 140 (3d Cir. 2010) ............................................................ 41

*United States v. Wright*,
838 F.3d 880 (7th Cir. 2016) ........................................................... 35

**District Court Decisions**

*United States v. Smith*,
No. CR 3:18-00097, 2019 WL 1232844 (S.D.W. Va. Mar. 15, 2019) ............. 25

*United States v. Williams*,
No. 1:08CR223-1, 2008 WL 11417466 (M.D.N.C. Sept. 16, 2008) ............... 25

**United States Code**

18 U.S.C. § 922 ................................................................................ 12

18 U.S.C. § 1512 ............................................................................. 12-13

18 U.S.C. § 3553 ............................................................................. 53

21 U.S.C. § 844 ............................................................................... 13

21 U.S.C. § 851 ............................................................................... 13

**Other**

Fed. R. Crim. P. 29............................................................................ 47

**Introduction**

This case arises from a late-night traffic stop in which police officers recovered two firearms from the passenger-side floorboard of an SUV occupied by the defendant, Adonis Marquis Perry, and his girlfriend, Beatrice McCarr. When the officers turned around to follow the SUV for a suspected tag violation, the SUV hit the gas, blew through two stop signs, and made two rapid right turns. The officers lost sight of the car; when they caught up to it, they saw that it had stopped in a parking lot and that the front-passenger-side door was wide open.

The officers ordered the occupants out of the car. They first watched McCarr exit the driver's side, then observed the defendant jump over the center console from the front passenger seat to the driver's seat, exiting through the same door. After the officers detained and started questioning the occupants, McCarr said that the car was hers and gave her consent to search it, which is how the guns were recovered. She told the officers that the firearms belonged to the defendant and put that statement in writing. The officers then learned that the defendant was a felon, so they arrested him, recovering a small amount of marijuana from his pocket.

The defendant spent months on jail calls trying to convince McCarr to recant her statement, avoid subpoena service, not attend court proceedings, and otherwise undermine the case against him. McCarr ultimately rebuffed the defendant's efforts. She consented to a search of the defendant's phone, which she had sole access to

1

while he was in custody. That phone contained selfies of the defendant holding up each firearm.

The evidence from the traffic stop, the pictures in the defendant's phone, his jail-call conversations with McCarr, and her trial testimony proved that the defendant was guilty of felon in possession of firearms, witness tampering, obstruction of justice, and possession of marijuana. Because there was no error in the defendant's conviction and sentence, this Court should affirm the judgment.

## Issues Presented

1.    Did the district court err in admitting evidence stemming from the traffic stop where the officers had ample justification to detain the defendant for the length of the stop and secured consent to search the car before completing it?

2.    Did the district court err in admitting evidence from a phone that McCarr had unfettered access to and had been in her sole custody for roughly seven months before she voluntarily turned it over and consented to its search?

3.    Did the district court err in denying the defendant's motion to dismiss for failure to preserve dashcam footage that was automatically deleted under department policy where the defendant only speculates the footage contained potentially exculpatory evidence and the officers followed policy by preserving their near-identical and better-quality body-camera footage?

4. Was the evidence from the traffic stop, the defendant's phone, and the jail-call conversations, as well as McCarr's testimony confirming his possession of the firearms, sufficient to convict him?

5. Given that each witness-tampering and obstruction offense of conviction requires proof of an element that the other does not, should those convictions be upheld on plain error review?

6. Does it conclusively appear from the record that one of the defendant's two trial attorneys was constitutionally ineffective for failing to withdraw here based on a threat the defendant made against the attorney in a prior state case, forcing that attorney to withdraw there?

7. Is the defendant's within-guidelines sentence presumptively reasonable?

### Statement of the Case

### A. The Traffic Stop

The defendant came to the attention of law enforcement during a traffic stop.

#### 1. *The SUV flees from the police.*

Around midnight on December 18, 2017, Officers Miller and Para were on patrol in the Huntersville neighborhood in Norfolk, Virginia, which is an area "known for … gang activity and violent crimes." JA279. The officers passed a dark-colored SUV with no front license plate traveling in the opposite direction. JA279,

JA954. Officer Miller, who was driving, also observed that the rear plate "looked like a piece of paper with marker on it." JA278, JA954. So he made a U-turn to investigate further.[1]

At that moment, Officer Miller saw the SUV "go through two stop signs," make "a quick right turn," and "accelerate in a way [that] appeared to be evasive." JA279, JA957. The officers gave chase, but lost contact with the SUV for "[a]pproximately 10 to 11 seconds." JA965. When they caught up to the SUV, it had pulled into an apartment complex parking lot. Officer Miller turned on the emergency lights and stopped behind the SUV. JA283, JA463, JA466, JA958.

2.    *The officers detain the SUV occupants to investigate further.*

The first thing the officers saw when turning into the parking lot was that the SUV's "passenger door was wide open," which indicated that "the passengers of the vehicle have fled." JA283, JA958. Instead, they observed a woman, later identified as Beatrice McCarr, exit the SUV from the driver's side and begin walking toward their police car. And they saw someone else—the defendant—who "[i]nitially … was reaching down in the passenger seat, and after about a second or so … jumped over the center console and came out the driver's door." JA283, JA387-JA388,

---

[1] The joint appendix contains only short excerpts of the traffic stop admitted at trial. The government is moving to supplement the appellate record with all the footage from Officer Miller's body-worn camera.

JA958.

Because the officers saw that the passenger-side door was open, and because they had just observed the defendant reaching toward the passenger-side floorboard, they drew their weapons, ordering the occupants "to show their hands and begin walking back towards the patrol vehicle." JA285, JA388, JA502. They then handcuffed the occupants "for officer safety" and separated them—Para questioning McCarr near the front of the SUV, and Miller talking to Perry at the patrol car. JA286-JA287, JA389-JA390. The officers detained the occupants to investigate "the license plate, why they appeared to be eluding [the police], and disregarding two stop signs, and the movement that we saw toward the floorboard, and why they both came out of the driver's side of the vehicle." JA285-JA286.

Roughly one minute into the stop, Officer Miller questioned the defendant about the defective paper tag he had observed. The defendant explained that McCarr "has a registration, and she has all the title, which is kind of indicating that it's her vehicle." JA291.

Officer Miller also asked for the defendant's identification, and, upon receiving the defendant's social security card, radioed dispatch to check if the defendant had "a valid license, if he has a concealed weapon permit, if he has a gang affiliation, if he's a sex offender, if t[he's] on a terrorist watch list, and if [he] ha[s] any active warrants." JA290.

5

Officer Miller then conducted a protective frisk of the defendant, which he explained was "[t]o make sure I wasn't putting him in the back of our car with a firearm or knife in his pants." JA292. Officer Miller observed "[a] blue bandana" hanging out of the defendant's pocket, which in his experience, was "indicative of" "[g]ang affiliation with a gang known as the Crips." *Id.* Around the same time, "Dispatch said, caution; [the defendant] had a gang affiliation." *Id.*

3. *McCarr gives consent to search the SUV, and the firearms and marijuana are recovered.*

About five minutes into the stop, Officers Miller and Para met by the SUV to discuss the status of their investigation, and Officer Para asked McCarr for consent to search the SUV, which she gave. JA294, JA306, JA393, JA503. Right after, Officer Miller continued investigating the suspected vehicle flight, asking "if this was where they lived." JA294. McCarr "indicated that she does not live there nor know anybody there," which told Officer Miller "[t]hat [his] suspicion was right; that it appeared they were trying to evade us." JA295.

At that point, Officer Para started searching the SUV, and Officer Miller returned to questioning the defendant, reading him the *Miranda* warnings from a card. JA295, JA960. Halfway through the warnings, Officer Miller heard Officer Para yell, "gun!" JA295, JA960. Officer Para had found a revolver "sticking out" of a woman's purse sitting on the passenger-side floorboard. JA394. Officer Miller returned to the SUV and saw the revolver sitting on the seat. JA297. Officer Miller

6

then read McCarr the *Miranda* warnings from the same card; she agreed to talk to Officer Miller and "said the gun was Adonis's, which was her boyfriend, and that was their family gun." JA297.

Roughly ten minutes into the stop, Officer Para recovered a second firearm, a Glock 9mm handgun loaded with an extended magazine, from underneath the front-passenger seat. JA298-JA299, JA396-JA397, JA503, JA961-JA962.[2] "After running the serial number on the Glock," Officer Miller discovered that "it was reported stolen out of Louisiana." JA300. McCarr said that the defendant "owned the guns" and later wrote "a statement to that effect," JA301: "I told the police the[y] were not my guns," but "that they we[re] his guns," JA458, JA1386.

After securing the firearms, Officer Miller learned that the defendant was a felon. JA303. So he arrested the defendant and conducted a search incident to arrest, recovering marijuana from the defendant's pocket. *Id.* The defendant admitted that the substance was "weed." JA303, JA963.

### 4.    *The defendant makes an additional statement after the stop.*

The officers took the defendant to the magistrate for booking. While waiting,

---

[2] Officer Miller's body-worn camera recorded each portion of the stop that he personally observed, including Officer Para securing McCarr's consent to search the SUV. But Officer Para mistakenly failed to activate his body-worn camera at the beginning of the traffic stop. JA396. After recovering the revolver, but before finding the Glock handgun, he realized his mistake, activated his camera, and returned to McCarr to re-obtain her consent on video. JA395-JA396.

the defendant acknowledged: "I jumped over the console from … the driver's side to the passenger's side. … [McCarr] jumped out of that passenger's door and ran around … the front of that car." JA1340; *see* JA304, JA964-JA965. The period that the officers lost contact with the SUV would "have been enough time for someone to run from the passenger side to the driver's side of the SUV." JA965.

### 5.    *Officer Miller preserves his body-camera footage, but did not think he could tag the dashcam footage.*

Reviewing his body-camera footage, Officer Miller "s[aw] the d[ashcam] in the body cam so [he] knew there wasn't going to be anything different on that." JA602. He concluded that his body-worn camera "caught the whole scene … and it appeared to be everything [he] needed." *Id.* The officers tagged their body-camera footage, but not any dashcam footage. Officer Miller did not believe he could tag the dashcam footage because "the time period" for doing so "had already passed." JA606. And he was not aware of a policy allowing supervisors to tag dashcam video. JA606-JA607. After 30 days, the unpreserved dashcam footage was "automatically deleted" per the police department's policy. JA561.

### 6.    *The defendant talks to McCarr using the jail phone.*

The defendant remained in local custody while his federal and related state cases remained pending. But McCarr was permitted to leave the traffic stop in the SUV. JA360, JA611, JA713. The SUV contained the defendant's HTC cell phone, which McCarr then "used to contact [the defendant] via jail calls, as well as members

8

of his family, as well as used it personally herself." JA611, JA1116. She used the phone "in Norfolk Virginia, as well as down in Georgia." *Id.* She knew the phone's password and had "access to the phone's contents." JA612.

McCarr took the HTC phone to her residence in "Jonesboro, Georgia, approximately 580 to 600 miles away from Norfolk." JA612. She had "primary access and control of the phone" at that time. *Id.* The defendant took no issue with McCarr's unlimited use of his phone. He encouraged it, asking her to use it to field his calls to her from jail. JA616. On a March 14, 2018 jail call, McCarr told the defendant that "she was viewing photos of the defendant and herself inside of the phone." JA615. His reaction: "He just laughed. He wasn't shocked. He wasn't mad that she made entry into his phone." *Id.*

In fact, the defendant called McCarr from jail "four to five times a day" for months. JA1123. In January 2018, knowing that McCarr had written a statement adverse to him, the defendant called the HTC phone several times to direct McCarr to write another statement recanting the original one. In one call, he asked McCarr to give the HTC phone to associates, including his cousin "Juice," whom he directed "to get [McCarr] to write a letter saying that … she lied" and to "get it notarized in the morning." JA1341, JA1433.

The next day, the defendant again contacted McCarr on the HTC phone and said "I'm gonna give you the [prosecutor]'s information so you can call her," "record

it," and "tell her that you don't want to [testify]. … You don't want to do that anymore." JA1348-JA1349. Minutes later, he called her again and told her what else to say to the prosecutor: "Just tell her like look man I'm not finna do this. … I lied because … [the officers] told me they was gonna take me to jail if I didn't say this. … And [the case] is dead from that point on." JA1352.

On March 14, 2018, the defendant gave McCarr advice on how to avoid a subpoena: "Listen, all you have to do is say, 'I never got subpoenaed. I don't live there.' That's all you have to say. … Because you don't live there; you know what I mean?" JA1353. And, on June 27, 2018, after learning that "the feds" were investigating his case, JA1360, he took a more direct approach: "This is what I need you to do, man. When they come and try to get you, don't be nowhere to be found." JA1365. At that time, McCarr had already been served with a federal subpoena, but she had not yet told the defendant. JA1137.

Once the defendant learned that McCarr had been subpoenaed to testify in a federal proceeding—"I'm supposed to be there on the 11th"— he became even more desperate, instructing her, "[d]on't talk to them," JA1364, and "[d]on't come, because my next court date is the 18th," JA1375. And "if you do not show up at the next court date, … they have to let me go." JA1377. Then he resorted to begging: "They is waiting for you to come here, man. Please, man, please don't do it man. … Man, swear to God you're not gonna do it, man." JA1378.

10

The defendant also tried to mislead and scare McCarr into not testifying. He first told her, "They can't even charge you if you don't come here. They can't get you for contempt of court, or nothing, now. I swear to God." JA1364. But in a later call that day, he admitted that McCarr would be committing a crime by not showing up—"it would be a contempt of court misdemeanor"—but told her to disregard the subpoena anyway. JA1370. He suggested that McCarr would be charged with firearm possession if she appeared in court and testified. "If you come to court on me, and you say it's mine, and I say it's not mine, that means it's yours. … It will hurt you more than it will hurt me." JA1367.

7.    *Officer Matthews obtains evidence from the HTC phone.*

Shortly after McCarr received the federal grand jury subpoena, the case agent, ATF Task Force Officer Justin Matthews, asked her to "bring [the HTC phone] back with her to Norfolk prior to the Federal Court proceeding." JA1077-JA1078. In response, "[s]he didn't seem shocked. She said that's fine. She no longer needed the phone for her personal use due to the fact of her cell phone had been turned on and more minutes added to it." JA617. And when she arrived in Norfolk on July 10, 2018, she gave Officer Matthews the phone and the password to access it. *Id.*

To "err on the side of caution," Officer Matthews tried to secure a search warrant for the phone from a magistrate judge. JA628. The magistrate judge denied the request, but suggested that Officer Matthews did not need a warrant to search the

phone, referencing the Fourth Circuit decision *Casella v. Borders*, 404 F. App'x 800, 803 (4th Cir. 2010) (unpublished per curiam decision). JA621-JA622, JA624.

The U.S. Attorney's Office directed the HTC phone to be searched. Virginia State Police officers used their Cellebrite program to extract data from the phone. JA1052, JA1079-JA1080. In that data were three sets of incriminating evidence: (1) photos of the defendant holding the Taurus revolver and Glock handgun loaded with the extended magazine, as well as other photos of those same firearms, JA244-JA246; (2) photos of what look like other firearms, JA1423-JA1424; and (3) text conversations with others in the weeks leading up to the traffic stop in which he discusses the locations of his gun, JA247-JA248.

## B.     Pretrial Proceedings

In July 2018, a grand jury sitting in Norfolk returned a two-count indictment charging the defendant with felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count One), and witness tampering by attempting to cause a summoned witness to be absent from an official proceeding, in violation of 18 U.S.C. § 1512(b)(2)(D) (Count Two). ECF No. 1.

On July 23, 2018, the defendant was arrested and made his initial appearance in federal court. ECF Nos. 5, 7.

In August 2018, the defendant moved to suppress all evidence stemming from his detention at the traffic stop. JA35-JA46. The government opposed the motion.

JA47-JA100. The motion was referred to a magistrate judge to aid in its disposition. JA106.

In September 2018, the grand jury returned a six-count superseding indictment adding four counts: witness tampering by attempting to influence, delay, and prevent testimony, in violation of 18 U.S.C. § 1512(b)(1) (new Count Two); witness tampering by attempting to cause a witness to evade legal process, in violation of 18 U.S.C. § 1512(b)(2)(C) (Count Three); obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2) (Count Five); and possession of marijuana, in violation of 21 U.S.C. § 844(a) (Count Six). ECF No. 24. The marijuana-possession charge was enhanced to a felony after the government filed an information under 21 U.S.C. § 851 to establish a prior drug conviction—felony possession of cocaine. ECF No. 41.

In October 2018, the defendant moved to dismiss the felon-in-possession count for failure to preserve the dashcam footage from the traffic stop. JA108-JA143. And he moved to suppress the HTC phone evidence for obtaining it without a warrant in violation of the Fourth Amendment. JA144-JA174. The government opposed both motions, JA175-JA252, which were also referred to a magistrate judge, JA515.

On October 24, 2018, the magistrate judge conducted a hearing on the first motion to suppress and heard evidence from the two arresting officers.

13

JA272-JA451. After receiving supplemental briefing from the parties, JA479-JA498, the magistrate judge issued a report and recommendation that the motion should be denied, noting that "this was no ordinary traffic stop" and highlighting seven "particularized facts" that gave the officers "ample justification to expand the investigatory detention." JA510-JA512. And although he "found Officer Miller to be incredibly credible," JA443, he concluded that Officer Para's testimony "that he had seen both guns in plain view prior to seeking consent to search the vehicle" "was not credible." JA504. The district court overruled the defendant's objections to the report and recommendation and adopted it in full. JA538-JA541.

On June 28, 2019, the magistrate judge conducted a hearing on the motion to dismiss and the second motion to suppress. He heard evidence from the Norfolk Police Department's preservation-policy expert, Officer Daniel Marko, and Officer Miller about how the body-worn camera and dashcam interrelate, as well as Officer Matthews about searching the HTC phone. JA542-JA646. After again receiving supplemental briefing from the parties, JA651-JA658, JA679-JA693, the magistrate judge issued two reports and recommendations that the motions should be denied. The district court overruled the defendant's objections and adopted the reports and recommendations in full, "with the caveat" "that McCarr had actual authority to consent to the search of the phone, not just apparent authority to consent to the search as concluded by the Magistrate Judge." JA752-JA755, JA756-JA761.

14

On October 2, 2019, the grand jury returned a second superseding indictment that added only the knowledge-of-prohibited-status element to Count One as required by *Rehaif v. United States*, 139 S. Ct. 2191 (2019).

### C.    The Defendant's Disruptive Behavior

As the district court observed, "the defendant has threatened death and physical harm against numerous attorneys, acted violently on various occasions, and has disrupted proceedings before this Court, including before the Magistrate Judge. In addition, the United States Marshals have advised that the defendant has exhibited erratic and sometimes violent behavior while in their custody." JA871.

The defendant "threatened to kill his attorney during a hearing in state court." JA861. He also threatened his second federal attorney and even lunged at him in the middle of a court proceeding. JA868-JA869. He threatened his third attorney and that attorney's family, going so far as to mail the attorney a letter "which included a threat to[ ] 'send some people' to counsel's law office." JA870. During a violent outburst at a jail meeting with his fourth attorney, the defendant said that "the attorney would not represent him because the attorney would not be around to do so." JA870. The "[c]orrectional officers had to forcibly remove the defendant from the room." *Id.* And the defendant's fifth court-appointed attorney reported "comments made by the defendant which caused the attorney to have '[i]mminent and reasonable fear for himself and his family's safety and well-being.'" JA870-

JA871. All those attorneys were granted leave to withdraw from this case.

The defendant finally took issue with his sixth court-appointed attorney, seeking the attorney's withdrawal based on a purported conflict. Counsel, who had previously represented the defendant in a 2016 state case, withdrew from that case after the defendant "made a threat to [him] while in the courtroom": "Do I have to f*ck him up or something." JA803. The defendant relied on that encounter and the attorney's subsequent withdrawal as the basis for his demand. The attorney saw no conflict. JA804. He consulted "the Virginia State Bar ethics hot-line," and the representative told him that he was "not required to move to leave to withdraw." JA841. The district court allowed the attorney to remain in the case and "appoint[ed] co-counsel." JA805.

### D.    The Trial

Trial commenced on June 22, 2021, and lasted three days. The government presented testimony from the defendant's former probation officer, Officer Miller, two jail-call custodians, a forensic scientist, the Virginia State Trooper who extracted the HTC phone data, Officer Matthews, McCarr, and the ATF's firearm-nexus expert. And the government moved into evidence the defendant's certified convictions; the statement of facts and plea hearing transcript supporting his prior federal conviction; Officer Miller's body-camera footage of the traffic stop and the defendant's statement while waiting for the magistrate; the recovered firearms,

marijuana, and HTC phone, as well as pictures of each; the HTC phone evidence; the no-clemency letter from the Virginia Secretary of the Commonwealth; the firearm nexus report; audio clips and transcripts from ten of the jail calls between the defendant and McCarr; the marijuana certificate of analysis; and McCarr's written statement to police.

The defendant moved for a judgment of acquittal after the government rested its case in chief. *See* JA1188. The district court deferred ruling on it until after the defendant put on his case, which consisted of one exhibit—a certificate of analysis showing that a fingerprint taken from the Glock handgun did not match the defendant's fingerprint. JA1192. The district court then denied the Rule 29 motion, concluding that "the evidence is sufficient for the jury to make the findings of fact to conclude as a matter of law the results on all six of the counts before it." JA1213.

After closing arguments, the district court instructed the jury on the applicable law. JA1266-JA1320. The jury received the case for deliberations at 3:42 p.m. on June 24, 2021, and returned with across-the-board guilty verdicts one hour and 39 minutes later. JA1321, JA1325-JA1327.

## E.    The Defendant's Sentencing

The Presentence Investigation Report calculated the defendant's total offense level as 34, including a base offense level of 20, a two-level enhancement because the offense involved three firearms—at least one additional gun from the pictures in

the HTC phone—a two-level enhancement because the recovered Glock handgun had been reported stolen, a four-point enhancement for possessing a firearm in connection with another felony offense—felony possession of marijuana—a two-point leadership-role enhancement, a two-point obstruction enhancement, and a two-point enhancement for reckless endangerment during flight. JA1535-JA1536.

The defendant's background resulted in 14 criminal history points, placing him into criminal history category VI. His advisory Guidelines range was thus 262-327 months' imprisonment. JA1559.

The government requested an upward departure or variance to 360 months' imprisonment, JA1396-JA1403, while the defendant objected to the multiple-firearm, leadership-role, and reckless-endangerment enhancements, JA1388, JA1394.

At sentencing, the district court sustained the objections to the multiple-firearm and leadership-role enhancements and overruled the objection to the reckless-endangerment enhancement, which reduced the guidelines range to 168-210 months in prison. JA1457, JA1470, JA1473, JA1605. After hearing argument, the district court denied the government's request to impose an upward departure or variance and sentenced the defendant to 210 months in prison—the top of the adjusted guidelines range—as well as a three-year term of supervised release. JA1506-JA1507, JA1516-1517.

This appeal followed.

## Summary of Argument

The defendant advances seven arguments on appeal, none of which is sufficient to vacate his conviction or sentence.

**I.**     The defendant disregards several important facts in arguing that the officers unduly prolonged his detention during the traffic stop: the officers' presence in a high-crime area late at night, the SUV occupants' unprovoked flight when noticing the police, the SUV's wide-open passenger-side door, the defendant kneeling on the passenger seat and climbing over the center console to follow McCarr out the driver's side, Officer Miller recovering the blue bandana from the defendant's pocket, and the dispatch report that he had gang affiliations warranted the investigation. And since the officers' questions fell within the scope of that investigation, his argument fails.

**II.**     The defendant had no legitimate privacy interest in a cell phone he had relinquished all physical control to McCarr, who lived roughly 600 miles away, when he was arrested and jailed roughly seven months before she gave consent to search it. And because she had complete access to the phone at the time Officer Matthews asked her for it, she had authority to consent to its search. Those who searched the phone relied in good faith on case law, as well as advice from the U.S. Attorney's Office. The overwhelming independent evidence at trial shows that any

error in admitting the phone evidence was harmless. The defendant's argument is without merit.

**III.**    The defendant's speculative claim that the officers acted in bad faith in failing to preserve the dashcam footage from automatic deletion under department policy cannot withstand scrutiny. The evidence would not even have been potentially exculpatory because, regardless which occupant was driving and which was the passenger, both officers saw the defendant in the passenger seat when they stopped behind the SUV, and the defendant—and later McCarr—confirmed their observations. But the officers did preserve their body-camera footage, which showed better-quality versions of the same thing that the dashcam footage would have. That alternative evidence dooms his argument.

**IV.**    The defendant ignores much of the trial evidence, attempts to insert claims that were not presented to the jury, and improperly attacks witness credibility in arguing that the district court improperly overruled his Rule 29 motion. There was instead substantial evidence supporting the jury's across-the-board guilty verdicts.

**V.**    The defendant's double jeopardy argument lacks merit because each of the witness-tampering and obstruction convictions requires proof of an element that the others do not.

**VI.**    The defendant's threat to harm his attorney in the 2016 state case did not trigger a conflict of interest requiring withdrawal here, and any purported

ineffectiveness did not conclusively appear from the record. His argument otherwise should be rejected because it "invite[s] [those] anxious to rid themselves of unwanted lawyers to" threaten their attorneys "on the eve of trial." *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993).

**VII.** Lastly, the defendant fails to rebut the presumption that his within-guidelines sentence is reasonable.

## Argument

### I. The officers had reasonable suspicion to detain the defendant for the duration of the stop.

The defendant contends that the officers unlawfully extended the stop's duration in violation of the Fourth Amendment. Def. Br. 24. In considering suppression-motion denials, this Court "review[s] the district court's factual findings for clear error, taking the evidence in the light most favorable to the government, and its legal conclusions de novo." *United States v. Jordan*, 952 F.3d 160, 165-66 (4th Cir. 2020). As the magistrate judge correctly concluded, "this was no ordinary traffic stop," and "the [c]ircumstances articulated by the officers justified continued detention essentially from the moment they initiated the stop." JA510.

A traffic stop "constitutes a 'seizure' under the Fourth Amendment and is thus subject to a reasonableness requirement." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015). And "[b]ecause a traffic stop is more akin to an investigative detention than a custodial arrest," courts review the stop under the two-prong

standard in *Terry v. Ohio*. *Id.* "Under *Terry*, a traffic stop is reasonable if (1) the stop is legitimate at its inception and (2) the officer's actions during the stop are reasonably related in scope to the basis for the stop." *United States v. Perez*, 30 F.4th 369, 375 (4th Cir. 2022). Only the second step is at issue here.

Along with investigating the traffic stop's "mission," an officer may engage in "certain safety measures" and "'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle … and determining whether the driver is subject to outstanding warrants." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1614-15 (2015)). The officer can take those actions "with respect to both the driver and passengers of a stopped vehicle to ensure officer safety." *Id.* at 383.

"[A]n officer cannot investigate a matter outside the scope of the initial stop unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity. … Reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" *United States v. Palmer*, 820 F.3d 640, 649-50 (4th Cir. 2016) (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)). "[F]actors that may be 'susceptible of innocent explanation' when taken in isolation can combine to 'form a particularized and objective basis' for a stop when considered

together." *United States v. Bumpers*, 705 F.3d 168, 174-75 (4th Cir. 2013) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)).

The magistrate judge highlighted "several particularized facts and circumstances that informed [the officers'] suspicions" justifying "the defendant's continued detention":

- "the time (around midnight)";

- the officers' "location (a known high-crime area)";

- the suspicious "nature of the observed traffic violation (an apparently hand-written vehicle tag bearing only a date)";

- the SUV's "acceleration through two stop signs when the police turned around";

- the officers' observation "that the car's passenger door was open and the occupants were already exiting when the officers arrived";

- the defendant's "climbing over the center console to exit the driver's side door," as well as the fact that "Officer Miller testified that he had never seen someone jump over the center console during a traffic stop before"; and

- Officer Miller's recovering "the blue bandana" from the defendant's "pocket, combined with the dispatch report that he had gang affiliations."

JA510-JA512.

Adding to that list, Officer Miller did not just observe the defendant jumping across the center console from the passenger seat; while McCarr was exiting, he saw "someone sitting in the passenger's seat and leaning towards the ground, the floorboard." JA283. Officer Para saw the same thing: the defendant was "reaching

23

down toward the floorboard." JA388. And "[a] suspect's suspicious movements can

... be taken to suggest that the suspect may have a weapon." *United States v. George*,

732 F.3d 296, 299 (4th Cir. 2013) (internal quotation marks omitted).[3]

As the magistrate judge pointed out, those facts were more than enough to

establish reasonable suspicion of ongoing criminal activity and to justify extending

the stop's duration. JA512. Indeed, the officers' "presence in an area of heavy

narcotics trafficking"—the Huntersville neighborhood—and their observing the

SUV occupants' "unprovoked flight upon noticing the police" would have been

sufficient for reasonable suspicion. *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119,

124-25 (2000)); *see United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

On similar, yet less compelling, facts, this Court affirmed a district court's

ruling that officers' "presence in a high drug and high violent crime area after 1 a.m.,

---

[3] To be sure, the magistrate judge found Officer Para not credible in observing the firearms in plain view before securing McCarr's consent to search the vehicle. But he credited the other parts of Para's testimony in formulating the list of facts supporting reasonable suspicion. JA510. He noted that "Officer Para's testimony and partial body camera footage are largely consistent with Officer Miller's." JA503. The magistrate judge also credited Officer Para's testimony "regarding the initial pursuit, the nature of the Huntersville neighborhood, and the subject's unusual exit from the vehicle," as well his testimony "that he confirmed McCarr owned the vehicle and obtained her consent to search it as shown on Officer Miller's body camera footage." *Id.* The defendant cannot rely on Para's adverse credibility determination to save him. And contrary to the defendant's claim, Officer Para did not tell Officer Miller about seeing the guns in plain view before asking for consent, JA405-JA410, so Officer Miller's observations were not "previously intertwined" with that statement, Def. Br. 27.

[the driver's] flight and [the passenger's] move into the driver's seat thereafter, provided reasonable suspicion for believing that [the passenger] was either armed or engaged in criminal activity." *United States v. Williams*, No. 1:08CR223-1, 2008 WL 11417466, at *5 n.4 (M.D.N.C. Sept. 16, 2008), *aff'd*, 394 F. App'x 983 (4th Cir. 2010); *see United States v. Smith*, No. CR 3:18-00097, 2019 WL 1232844, at *2 (S.D.W. Va. Mar. 15, 2019), *aff'd*, 800 F. App'x 190 (4th Cir. 2020).

In short, the defendant's argument fails because reasonable suspicion is a rather low standard that is easily met on these facts.

Despite that low standard, the defendant improperly singles out certain investigative tactics he contends went beyond the scope of the stop. He tries to limit the stop's scope as applied to him by labeling himself the passenger. Def. Br. 23. But Officer Miller "d[i]dn't know who was driving the vehicle" since both occupants exited from the driver's side. JA289. That allowed him to treat the defendant as the driver. *See United States v. Myers*, 986 F.3d 453, 457 (4th Cir. 2021) (noting that officers were permitted to make commonsense inferences during stop of multi-passenger car). In any event, the defendant later admitted to driving the SUV, and McCarr confirmed his admission at trial. *See United States v. Giddins*, 858 F.3d 870, 885 n.9 (4th Cir. 2017) (reviewing court may look at entire record in affirming denial of suppression motion).

Officer Miller's approach to the investigation did not violate the defendant's rights even if he were the passenger. "[A]n officer reasonably may search a computer database during a traffic stop to determine an individual's prior contact with local law enforcement, just as an officer may engage in the indisputably proper action of searching computer databases for an individual's outstanding warrants." *Hill*, 852 F.3d at 383. And the "officer may take such measures with respect to both the driver and passengers of a stopped vehicle to ensure officer safety." *Id.*

The defendant tries to circumvent that precedent by claiming that, once "handcuffed in the back of the patrol car," officer safety was no longer an issue. Def. Br. 24. But Officer Miller made clear that he was still concerned for his safety after he had handcuffed the defendant and while having dispatch run the defendant's information. JA286. This Court should decline the defendant's invitation to limit what officers can do to protect themselves at "traffic stops[,] [which] are especially fraught with danger to police officers." *United States v. Robinson*, 846 F.3d 694, 699 (4th Cir. 2017) (en banc) (internal quotation marks omitted).

What's more, the officers did not need reasonable suspicion to ask McCarr for consent; rather, the two concepts are independent reasons "to support the extension of the stop." *Hill*, 852 F.3d at 381. And asking for consent to search does not improperly prolong a traffic stop so long as it is "contemporaneous with the officers' diligent pursuit of the mission of the stop." *Id.* at 384. Officer Para secured McCarr's

consent to search the SUV before the stop had ended, JA294-JA295, satisfying this requirement. That consent allowed the officers to extend the stop and gave them "the authority to detain the occupants while a proper search [was] conducted." *United States v. Smith*, 704 F.2d 723, 725 (4th Cir. 1983).

The defendant continues his divide-and-conquer approach to reasonable suspicion by arguing that "[t]he mere fact of the time and location of the stop is not an objectively reasonable basis to obtain [him]." Def. Br. 25. But while a person's presence in a high crime area or the time of day, alone, do not provide reasonable suspicion, they fall "among the relevant contextual considerations in a *Terry* analysis," *Wardlow*, 528 U.S. at 124, and, when considered with the other articulable facts, support the officers' investigative tactics.

The defendant also mischaracterizes his detention as an arrest, Def. Br. 28, after conceding that "the applicable standard is *Terry*," *id.* at 23. But his description of what happened—Officer Miller "plac[ing] his hands on [the defendant], handcuff[ing] him, and put[ting] him in the back of the patrol car," *id.*—tracks the beginning of the traffic stop in *Elston v. United States*, 479 F.3d 314 (4th Cir. 2007). There, "the district court committed no error in concluding that Elston's initial detention by the officers did not rise to the level of a custodial arrest." *Id.* at 320.

The defendant's attack on the officers' experience, Def. Br. 27–28, likewise falls flat. They received the appropriate police training, and Officer Miller had by

27

that time conducted "150 to 200" traffic stops, JA277, while Officer Para had been involved in "[a]nywhere from 70 to a hundred" stops, JA382. And even if the officers were inexperienced, "their purported inexperience does not, by itself, make their suspicions unreasonable. Here, the other relevant factors, even with the officers' relative inexperience, provide the reasonable suspicion necessary for a constitutional stop." *United States v. McAllister*, 31 F. App'x 859, 865 n.3 (6th Cir. 2002) (unpublished).

Notably, the defendant did not include in his objections to the magistrate judge's report and recommendation—or raise in the district court at all—his arguments that jumping over the console was not an objective basis to prolong the stop, that the officers' inexperience detracts from the reasonable suspicion analysis, and that his detention should be deemed an arrest. He thus "waive[s] those arguments on appeal." *United States v. Hill*, 849 F.3d 195, 201 (4th Cir. 2017).

Finally, the officers executed their tasks with reasonable diligence given the short amount of time they spent fulfilling the mission of the stop. Officer Miller testified that the officers efficiently performed their tasks, obtaining McCarr's consent in five minutes, while the average traffic stop takes "[a]nywhere from 15 to 20 minutes." JA306. *Compare Hill*, 852 F.3d at 382 (concluding that officers' failure to account for two minutes in a 20-minute stop "does not support an inference that the stop was extended unlawfully for a de minimis amount of time in violation of

28

*Rodriguez*").

This Court should thus affirm the district court's decision denying the motion to suppress evidence obtained from the traffic stop.

## II.    The HTC phone was lawfully searched.

The defendant next argues that McCarr had neither actual nor apparent authority to consent to searching the HTC phone and that it was thus accessed in violation of the Fourth Amendment. Def. Br. 28-38. As with the first suppression issue, this Court reviews the lower court's factual findings for clear error and its legal conclusions de novo. *Jordan*, 952 F.3d at 165-66. The defendant's argument should be rejected for four reasons: (1) he had no "legitimate expectation of privacy in the area searched," *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)—a cell phone that he had transferred to McCarr, who lived roughly 600 miles away, while he was in custody for seven months; (2) McCarr, who had complete control over and access to the phone during that time, consented to the search—an exception to the warrant requirement; (3) those searching the phone reasonably relied in good faith on binding and non-binding case law, as well as the AUSA's advice; and (4) even if the phone were unconstitutionally searched, its contents' admission was harmless error under *Chapman v. California*, 386 U.S. 18, 24 (1967), in light of the independent, overwhelming evidence that the defendant had possessed the recovered firearms.

29

1. *The defendant had no legitimate privacy interest in the HTC phone.*

The defendant fails to show that he had a legitimate expectation of privacy in the HTC phone when it was searched without a warrant. "When there is no reasonable expectation of privacy, the Fourth Amendment is not implicated. … A search or seizure for Fourth Amendment purposes does not occur, therefore, when a person lacks a reasonable expectation of privacy in the material examined." *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012) (citations omitted). The defendant has the initial burden to "prov[e] that he had a legitimate expectation of privacy in the invaded place." *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (internal quotation marks omitted). To do so, he "must have a subjective expectation of privacy, … and that subjective expectation of privacy must be objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable." *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013) (citations and internal quotation marks omitted).

To be sure, Officer Matthews and McCarr acknowledged that the defendant owned the phone. Def. Br. 35. But a bare ownership interest is not enough to show an objectively reasonable expectation of privacy. "[O]ne who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." *Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018). The key is whether the defendant can show that he "exercised a right

30

to control the cell phone or its contents after giving the phone to [McCarr]." *Casella v. Borders*, 404 F. App'x 800, 803 (4th Cir. 2010) (unpublished per curiam decision). He cannot.

*Casella* is instructive. There, this Court rejected an almost identical argument in ruling that a plaintiff failed to state a § 1983 claim under the Fourth Amendment. She "lent her boyfriend a cellular phone containing images of her nude body," and police "eventually view[ed] these images in an act of voyeurism" after recovering the phone at his arrest. *Id.* at 801. This Court held that the plaintiff "lacked a reasonable expectation of privacy in the contents of the cellular phone because she lacked control or dominion over the phone when officers seized it." *Id.* at 801.

In doing so, this Court explained that the plaintiff failed to demonstrate that "she exercised a right to control the cell phone or its contents after giving the phone to [her boyfriend]." *Id.* Nor could she claim that, "after she relinquished possession of the phone," she "had the right or ability to exclude others from viewing the images stored therein." *Id.* As the Court explained, "[t]he mere absence of [her] consent to transmit or share the images" did "not make her expectation of privacy in those images reasonable." *Id.* Finally, the panel noted that "nearly two months had passed since [she] had lent [her boyfriend] the phone, suggesting she lent the phone to [him] for an extended period rather than on a day-to-day basis," further diminishing her expectation of privacy. *Id.*

When compared with *Casella*, this case is not a close call. "The parties d[id] not dispute whether Casella had a subjective expectation of privacy in the contents of the cellular phone" because nobody disputed that she owned the phone. *Id.* at 802. But that "expectation of privacy was [not] reasonable once she relinquished physical control of it." *Id.* So too, here.

The defendant intentionally gave up the ability to exclude McCarr by ensuring she had the phone's password. And as in *Casella*, McCarr accessed the contents of the phone, including the defendant's photos, with his knowledge. Although the defendant did not "expressly authorize[ ] McCarr … to give consent to search his property," Def. Br. 35, "hopes and intentions do not make Fourth Amendment rights," *Casella*, 404 F. App'x at 803. The roughly seven-month period that McCarr possessed the phone was also more than three times longer than the "extended" two-month period deemed inconsistent with a reasonable expectation of privacy in *Casella*. *Id.* at 803-04.

The defendant argues that he "did not surrender his expectation of privacy in the ownership of the phone" because "there is no evidence" that McCarr had anything other than "limited use of his property." Def. Br. 34-35. But *he* has the burden to show a legitimate privacy interest, and he failed to satisfy that burden in the district court. "Imprisoned as he was, [the defendant] could not hope to exercise any control over" the phone. *United States v. Gallo*, 846 F.2d 74, 1998 WL 46293,

at *3 (4th Cir. 1988) (unpublished per curiam table decision). He cites no evidence, and there is no evidence, that he imposed any limitation on her use of the phone from jail. The opposite is true. For example, on the March 14, 2018 jail-call recording played at the evidentiary hearing, instead of objecting to McCarr accessing his phone and using it to look at pictures without his consent, he asked her if she was "saving" pictures onto the phone. JA615. At the end of the discussion, he laughed approvingly. *Id.*

The defendant had no reasonable expectation of privacy, and thus no Fourth Amendment right, in the HTC phone when it was searched.

2.     *McCarr had authority to consent to searching the HTC Phone.*

If this Court concludes that the defendant had a Fourth Amendment right in the HTC phone, the warrantless search of the phone did not violate that right because of the third-party-consent exception to the warrant requirement. The district court correctly ruled that McCarr "had actual authority to consent to the search of the phone, not just apparent authority." JA759.

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it … may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974) (footnote omitted). "Consent to search is valid if it is (1) knowing

33

and voluntary, and (2) given by one with authority to consent." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007).

"Common authority" in this context is not merely a question of property interest. Rather, it requires evidence of "mutual use" by one generally having "joint access or control for most purposes." *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7). Mutual use "makes it 'reasonable to recognize that any of the co-[users] has the right to permit the inspection in h[er] own right and that the others have assumed the risk that one of their number might permit the common [effects] to be searched.'" *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7).

McCarr's possession and active use of the HTC phone at the defendant's instigation more than satisfy the requirements for common authority over it. Simply because she acknowledged that it was the defendant's phone does not affect the conclusion—the focus of the test is not on formal ownership, but rather on "mutual use," and she had exclusive access and control of the phone and its contents for seven months while the defendant had none.

For password-protected items like the HTC phone, a controlling factor in determining authority to consent is whether the third party has "access to [the defendant's] password[ ]" or whether the defendant "concealed his password from" the third party. *Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001). The defendant's jail calls to McCarr show that she knew the phone's password and that he approved

34

of her using his password. JA615. That the defendant shared the phone's password with McCarr so that she could use and access the phone while he was in jail is determinative evidence that she had authority to consent to its search. *See United States v. Gardner*, 887 F.3d 780, 784 (6th Cir. 2018); *United States v. Thomas*, 818 F.3d 1230, 1241 (11th Cir. 2016); *cf. United States v. Wright*, 838 F.3d 880, 886 (7th Cir. 2016) (finding actual authority where defendant's children knew password to computer although wife, who did not, provided consent).

Contrary to the defendant's assertion otherwise, Def. Br. 34-35, and as discussed above, there is no evidence the defendant limited McCarr's access to or control over his phone. Instead, when McCarr told him about her unfettered access to the phone's contents—including family pictures that "can be inferred … were in the photo folder … inside of the phone," Def. Br. 36, he laughed. *See Wright*, 838 F.3d at 886 ("[T]here's no indication that Wright made any effort to prevent Hamilton from using the computer despite knowing that she and her children did so frequently."). If the defendant's version of the facts were true, he would have objected.

McCarr thus had authority to consent to a search of all parts of the phone, including "the individual compartments within the phone," Def. Br. 36. And since the defendant did not raise his "compartments" argument in the district court,

including in his objections to the report and recommendation, he waived it on appeal. *See Hill*, 849 F.3d at 201.

That is why the defendant's reliance on *United States v. Block*, 590 F.2d 535 (4th Cir. 1978), fails. *Block* involved a locked trunk stored on the premises of a third party who did not have the key or other "means of access to its interior nor permission to open it." *Id.* at 540. Here, there is no question that the HTC phone was not merely being stored on McCarr's person, but that she was free to use it. She possessed a clear indication of authority to use the phone because she knew the passcode to open it.

The defendant also contends that consent is invalid because, "[e]ven though Matthews knew of [his] location at the jail, and that [he] was the owner of the cell phone, Matthews did not request to search the phone from [him]." Def. Br. 31. The Supreme Court rejected a similar argument when it held that "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." *Fernandez v. California*, 571 U.S. 292, 302 (2014).

Even if McCarr did not have actual authority to consent to searching the HTC phone, she had apparent authority. "As long as the facts available to the officer at the moment warrant a person of reasonable caution in the belief that the consenting party had authority, apparent authority to consent exists, and evidence seized or

36

searched pursuant to that consent need not be suppressed." *Buckner*, 473 F.3d at 555 (alterations and internal quotation marks omitted). And "[w]hether … officers reasonably believed that [the third party] had authority to consent to a search … depends on viewing these facts in light of the totality of the circumstances known to the officers at the time of the search." *Id.*

Before seeking McCarr's consent to search the HTC phone, Officer Matthews listened to the defendant and McCarr's jail-phone conversations, during which he observed "[t]hat she had primary access to the phone, she knew the code to the phone to get into it, and she was viewing photos of the defendant and herself inside of the phone." JA615. And Officer Matthews "did not have any indication from [McCarr], or any of the attendant circumstances," that the defendant had limited her access to the HTC phone. *Buckner*, 473 F.3d at 555. Officer Matthews also knew that McCarr had possessed the phone for several months, and during most of that time she had resided in Georgia while the defendant remained in custody in Norfolk.

"[T]he totality of the circumstances provided [Officer Matthews] with the basis for an objectively reasonable belief that [McCarr] had authority to consent to a search of the [HTC phone]." *Id.* So Officer Matthews was "justified in relying on [McCarr]'s consent to search the [HTC phone] and all of its files, such that no search warrant was required." *Id.* at 556.

As the magistrate judge explained, "the government's unsuccessful attempt to secure a search warrant for the HTC phone does not automatically invalidate the later consent search," and it "did not preclude officers from relying on a separate basis to justify the search." JA725; *see United States v. Gearhart*, 326 F.2d 412, 413-14 (4th Cir. 1964) (rejecting argument that "misconceived reliance by officers upon an unnecessary warrant, which later is found invalid, precludes independent justification of an arrest or search"). Nor is it "ample proof that [Officer] Matthews knew he did not have valid consent to search [the defendant]'s phone." Def. Br. 35. Officer Matthews testified that the only reason he applied for the warrant was to "err on the side of caution," JA630, and the magistrate judge and district court credited that response, JA725, JA760.

Finally, the defendant contends that McCarr's consent was not voluntary. Def. Br. 30-31, 36-37. It was. "The question whether consent to search is voluntary— as distinct from being the product of duress or coercion, express or implied — is one 'of fact to be determined from the totality of all the circumstances.'" *United States v. Azua-Rinconada*, 914 F.3d 319, 324 (4th Cir. 2019) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Further, "because the question is one of fact, review on appeal is conducted under the clear error standard." *Id.*

The magistrate judge correctly observed that "[t]he uncontradicted evidence shows that McCarr did consent, and that her choice to turn over the phone to Agent Matthews was voluntary and free from coercion." JA730.

Nothing in McCarr's trial testimony contradicted those factual findings. And although Officer Matthews "did not inform McCarr that she had the right to refuse to turn over [the defendant]'s phone" or that "she had the right to ask [the defendant] for consent," Def. Br. 30, those facts are not prerequisites for a finding of voluntary consent—"the Government need not demonstrate that the [person searched] knew of [the] right to refuse consent to prove that the consent was voluntary." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc); *Bustamonte*, 412 U.S. at 232-33.

The defendant cites the fact that Officer Mathews told McCarr that there were penalties for failing to appear before a grand jury and for testifying falsely. But none of this amounts to coercion. First, officers are permitted to tell suspects the truth. *See United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987). Second, even assuming the topics covered by Officer Matthews affected McCarr's decision to turn over the phone—and there is nothing in the record suggesting as much—"the apprehension of 'get[ting] in trouble' presents itself in every consent-to-search investigation into illegal conduct. Plus, [Officer Mathews] did not engage in any improper conduct or otherwise bend [McCarr's] will." *Gardner*, 887 F.3d at 784; *see also United States*

*v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012) ("[S]tatements by law enforcement officers that are merely 'uncomfortable' or create a 'predicament' for a defendant are not ipso facto coercive.").

In short, neither the district court nor the magistrate judge clearly erred in finding that McCarr's consent was freely and voluntarily given.

3.      *The HTC phone was searched in good faith.*

If the Court concludes that the defendant had a Fourth Amendment right in the phone and that the right was violated because neither McCarr's actual nor her apparent consent to search the HTC phone was valid, then it should still affirm under the good faith exception to the exclusionary rule. When deciding whether officers acted in good faith, courts look at the totality of the circumstances. *See United States v. McKenzie-Gude*, 671 F.3d 452, 458 (4th Cir. 2011).

In searching the HTC phone without a warrant, the officers reasonably relied on both "binding precedent," *Davis v. United States*, 564 U.S. 239-41 (2011); *see, e.g.*, *Rakas*, 439 U.S. at 143, and "unpublished opinion[s]," *United States v. Stephens*, 764 F.3d 327, 337 n.11 (4th Cir. 2014); *see Casella*, 404 F. App'x at 804. Indeed, the Supreme Court has held the exclusionary rule inapplicable where an illegal "warrantless search" was conducted in good faith reliance on, in large part, holdings and dicta of various courts of appeals. *United States v. Peltier*, 422 U.S. 531, 541 (1975). Many federal courts of appeals have followed suit. *See, e.g.*, *United*

40

*States v. Katzin*, 769 F.3d 163, 184 (3d Cir. 2014) (en banc) ("By considering these non-binding decisions in our good faith analysis, we do no more than did the Supreme Court in *Peltier*.").

Further, "the agents' consultation with the AUSA also supports [the] conclusion that a reasonable agent would have believed in good faith that the" warrantless search of the HTC phone "was legal." *Id.*; *see United States v. McLamb*, 880 F.3d 685, 691 (4th Cir. 2018) ("In such cases, consultation with government attorneys is precisely what *Leon's* 'good faith' expects of law enforcement. We are disinclined to conclude that a warrant is 'facially deficient' where the legality of an investigative technique is unclear and law enforcement seeks advice from counsel before applying for the warrant."); *United States v. Tracey*, 597 F.3d 140, 153 (3d Cir. 2010) (crediting "AUSA's advice" because it was "given pursuant to a DOJ-wide policy—presumably based on the legal landscape … that the agents' conduct did not require a warrant").

Under the totality of the circumstances, the involved officers reasonably relied in good faith on the above factors in searching the HTC phone without a warrant.

4.    *Admitting the HTC phone evidence at trial was harmless error.*

Even if the search of the HTC phone violated the Fourth Amendment, its exclusion would not have altered the result at trial. "A constitutional error is harmless when it appears 'beyond a reasonable doubt that the error ... did not

41

contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 2 (1999) (quoting *Chapman*, 386 U.S. at 24). The purpose of such harmless error review is to prevent the "setting aside [of] convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman*, 386 U.S. at 22.

Admitting the firearm evidence from the defendant's phone was harmless error in light of the overwhelming evidence of his guilt on the felon-in-possession count. The government presented independent evidence that the defendant, while driving the SUV, first attempted to evade the officers, then reached down in the passenger seat—toward the direction of the firearms—and finally jumped over the center console, exiting out of the driver's-side door in an attempt to distance himself from the firearms. McCarr, who had already made two statements at the traffic stop that the firearms were the defendant's, repeated her observations on the stand. And the defendant's months-long effort to obstruct justice and pressure McCarr into first recanting her statement, then avoiding the subpoena, and finally not showing up to court proceedings further suggested his guilt. *See United States v. Van Metre*, 150 F.3d 339, 352 (4th Cir. 1998) ("Evidence of witness intimidation is admissible to prove consciousness of guilt").

## III.  The officers did not act in bad faith in failing to preserve the dashcam footage, which was neither exculpatory nor irreplaceable.

The defendant also argues that "the officers' failure to preserve the dashcam

video deprived him of his right to present exculpatory evidence regarding the details of the traffic stop." Def. Br. 39. This Court reviews the district court's ruling on a motion to dismiss de novo, *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002), while factual findings are reviewed for clear error, *United States v. Woolfolk*, 399 F.3d 590, 594 (4th Cir. 2005). The defendant's argument is without merit because (1) he wrongly speculates that the dashcam footage was potentially exculpatory; (2) several pieces of comparable evidence were readily available; and (3) he cannot point to any evidence of bad faith.

Under the Due Process Clause of the Fourteenth Amendment, the Supreme Court developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (internal quotation marks omitted). Evidence must be preserved when it "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 488-89. If the evidence is only "potentially useful," the defendant must further show that law enforcement destroyed the evidence in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). Bad faith "requires that the officer … intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during

his criminal trial." *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (Wilkinson, C.J., concurring).

The defendant only argued below that the erased dashcam footage was "potentially exculpable," JA112, so he had "to provide evidence of a bad faith deprivation carried out by" the officers—"a matter on which the burden plainly rests with" him. *Jean*, 221 F.3d at 663.

The defendant does not know what the dashcam would show, and that is fatal to his argument. A defendant's "purely speculative" view that evidence could be "exculpatory" is not enough to satisfy this factor. *United States v. Allen*, 27 F. App'x 168, 170 (4th Cir. 2001) (unpublished per curiam decision); *see United States v. Young*, 916 F.3d 368, 383 (4th Cir. 2019).

The evidence instead indicates that the footage would not be exculpatory. The subject-matter expert's unrebutted testimony at the hearing made clear that, "[b]ased on the positioning of the officer and the positioning of the camera, … [the bodycam and dashcam] captured the same thing." JA592. And "the actual quality of the [bodycam] footage is significantly better and far more reliable" than the dashcam footage. JA569. "The dashcam turned on right at the same time" as the bodycam. JA600. Notably, the dashcam would have captured less of the SUV than the bodycam because Officer Miller "parked the police cruiser at an angle." JA597. Since the bodycam footage is not exculpatory, the dashcam footage cannot be, either.

The defendant moves the goalposts by arguing "[t]he issue of who was the driver of the SUV is relevant to the question of who may have possessed the firearms on the night of the incident." Def. Br. 39. The relevant question is not who was driving, but who was the last person to be seen in the passenger seat before exiting the vehicle. The officers and the defendant all agree that it was him, further supporting the conclusion that the dashcam footage would not be exculpatory.

Officer Miller's and McCarr's testimony, as well as the body-camera footage, were "readily available sources to replace the missing [dahscam footage]." *United States v. Matthews*, 373 F. App'x 386, 391 (4th Cir. 2010) (unpublished per curiam decision). Again, the officers were consistent with each other about the defendant being in the passenger seat when they arrived. And the evidence shows that the bodycam footage was better evidence of the moments leading up to the defendant's arrest than the dashcam footage would be. The defendant offers no convincing argument that the dashcam footage was irreplaceable.

The defendant also cannot show that any of the government actors purportedly responsible for preserving the dashcam footage "intentionally withheld" the dashcam footage "for the purpose of depriving [him] of the use of that evidence during his criminal trial." *Jean*, 221 F.3d at 663.

The defendant suggests that Officer Miller violated department policy by failing to tag the dashcam footage. But it is not enough to show that Officer Miller

failed to comply with the policy. *See, e.g.*, *United States v. Varner*, 261 F. App'x 510, 517 (4th Cir. 2008) (unpublished per curiam decision) (holding bad faith not inferred even by violating federal statute in destroying evidence). And even then, the officers could not preserve the dashcam footage themselves, which instead "required intervention by a supervisor after the video had been uploaded to the department server." JA559, JA704.

The subject-matter expert testified that "the [relevant] policy is" that "if [officers] checked the body cam footage, and its sufficient, it covers everything, then [they] don't have the need to go to the supervisor to flag the dash cam footage." JA567. Officer Miller did that. The subject-matter expert added that when suspects request video footage, like the defendant did here, Def. Br. 40, officers should tell them "that they need to go through either the public information officer or through their attorney to gain access to the video," JA570. Officer Miller did that, too, JA600-JA601, so he did not violate any policy. There is no evidence that anyone else did, either.

The district court's decision denying the motion to dismiss should be affirmed.

## IV.    Substantial evidence supported the jury's verdict.

The Supreme Court has consistently reiterated that "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence

admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). Thus, "a jury verdict '*must be sustained* if there is substantial evidence, taking the view most favorable to the Government, to support it.'" *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (emphasis in original) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). In reviewing a conviction for sufficiency, courts must "defer to the jury's determinations of credibility and resolutions of conflicts in the evidence, as they are within the sole province of the jury and are not susceptible to judicial review." *United States v. Louthian*, 756 F.3d 295, 303 (4th Cir. 2014).

In challenging the evidence supporting the felon-in-possession conviction, the defendant first improperly injects into the analysis Officer Para's plain-view testimony, which was not presented to the jury. Rule 29(b) of the Federal Rules of Criminal Procedure permits a district court to reserve its decision on a motion for judgment of acquittal made after the government closes its evidence, which the district court did here, JA1188, but provides that if the court does so, it "must decide the motion on the basis of the evidence at the time the ruling was reserved." The Advisory Committee Notes to the 1994 Amendments to Rule 29 provide that an appellate court, reviewing a judgment of acquittal under Rule 29(b) is "similarly limited." *See United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). The defendant declined to call Officer Para to the stand at trial (nor could he, since "[a] party is not free to impeach the credibility of a witness simply for the sake of doing

47

so," *United States v. Douglas*, 408 F.3d 922, 927 (7th Cir. 2005)). He thus forfeits any ability to rely on that potential trial testimony in this appeal.

The defendant next attacks the credibility of McCarr. *See* Def. Br. 13-15. But this Court "do[es not] consider the credibility of witnesses" under the "substantial evidence" standard. *United States v. Burfoot*, 899 F.3d 334, 334 (4th Cir. 2018). The jury's verdict reflects that it found McCarr's testimony credible. This Court should not disturb that finding.

What's more, even if "[t]he evidence shows McCarr had actual possession of the revolver and constructive possession of the Glock," Def. Br. 45, so did the defendant. McCarr's testimony that he gave her the revolver only strengthened the case against him—he had to possess the gun to give it to her. She also testified that the defendant possessed the Glock handgun when he pointed it at McCarr and threatened to kill her with it. JA1135-JA1136.

The defendant's attack on the pictures of him holding those same firearms likewise fails. The Glock handgun's serial number matched the number on the Glock handgun the defendant held in one picture, and the Taurus revolver's serial number matched the partial serial number of the revolver he held in another picture. JA1083 JA1085, JA1172-JA1174, JA1181.

Turning to the obstruction counts, the defendant claims that his "intent was to convince McCarr to recant her false statements and to testify truthfully." Def. Br.

47. But as McCarr pointed out, what the defendant called "the truth" was anything but. JA1130, JA1144-JA1145.

Finally, the defendant challenges the marijuana's chain of custody, Def. Br. 49, something he failed to do at trial, thus failing to preserve that argument on appeal. "This means his challenge is forfeited unless a manifest miscarriage of justice has occurred." *United States v. Miller*, 41 F.4th 302, 315 (4th Cir. 2022) (internal quotation marks omitted). And "it would be unjust to reverse [the defendant]'s conviction given the mountain of evidence against him," *id.* (internal quotation marks omitted), including his on-camera admission that the substance recovered from his pocket at his arrest was "weed," JA963.

Given the strong evidence of the defendant's guilt, the jury did not plainly err in convicting him on all counts.

## V. The convictions for witness tampering and obstruction do not violate principles of double jeopardy.

For the first time, the defendant challenges his four witness-tampering and obstruction-of-justice convictions as "the same act—[the defendant] allegedly attempting to dissuade McCarr from being a witness against him at trial." Def. Br. 50. Since he did not raise this issue in the district court, it is forfeited on appeal and is reviewed for plain error. *See United States v. Jarvis*, 7 F.3d 404, 409 (4th Cir. 1993). Under the plain error standard, the defendant bears the burden of showing that (1) an error occurred, (2) the error was plain, and (3) it affected his substantial

rights. *See United States v. Olano*, 507 U.S. 725, 732 (1993). If he makes such a showing, the correction of such error lies within this Court's discretion, which it "should not exercise ... unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks and alterations omitted).

The defendant fails at step one, as there was no error. "Where the issue is solely that of multiple punishment, as opposed to multiple prosecutions, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *United States v. Studifin*, 240 F.3d 415, 418 (4th Cir. 2001) (internal quotation marks omitted). "The same conduct can support convictions and sentencing under two different federal statutes as long as each statute requires proof of an element that the other does not." *United States v. Johnson*, 219 F.3d 349, 358 (4th Cir. 2000). And "[i]f the elements of the two statutes do not necessarily overlap, then multiple punishments are presumed to be authorized absent a clear showing of contrary Congressional intent." *Id.* at 359 (internal quotation marks omitted).

Here, each offense of conviction requires proof of an element that the other does not:

- **Count Two** required proof that the defendant acted "with intent to influence, delay, or prevent" McCarr's testimony "in an official proceeding or to cause or induce her to withhold testimony from an official federal proceeding," JA1294;

50

- **Count Three** required proof that the defendant acted "with intent to cause or induce" McCarr "to evade legal process summoning her to appear in an official federal proceeding," JA1298-JA1299;

- **Count Four** required proof that the defendant acted "with the intent to cause or induce" McCarr "to be absent from an official proceeding to which she had been summoned by legal process," JA1303; and

- **Count Five** required proof that "the defendant intended to commit the crime of obstructing, influencing, or impeding an official proceeding; and … that the defendant did some act that was a substantial step in an effort to bring about the crime and accomplish the crime." JA1307.

The defendant thus "has made no showing defeating the presumptive availability of multiple punishments for these separate offenses" of "obstruction of justice and witness tampering." *United States v. Neal*, 458 F. App'x 246, 249 (4th Cir. 2011) (unpublished per curiam decision). His convictions pose no double jeopardy concerns.

## VI. The defendant's previous violent threat against his attorney did not create a conflict of interest requiring that attorney's withdrawal.

The defendant contends that the refusal of one of his two trial attorneys to move to withdraw from the case based on a purported conflict of interest violated "his Sixth Amendment right to effective assistance of counsel." Def. Br. 51. As he acknowledges, this Court "may address an ineffective assistance claim on direct appeal only if the lawyer's ineffectiveness conclusively appears from the record." *Id.* That is not the case here, where the defendant's basis is that the attorney had withdrawn from his prior state case after the defendant had threatened him in court.

51

JA803.

The defendant is wrong in claiming that "the court refused to relieve [this attorney] for the same reason it relieved the other [five] attorneys." Def. Br. 52. Unlike those other attorneys, this one saw no conflict and did not seek withdrawal after consulting "the Virginia State Bar ethics hot-line," JA841, breaking the cycle of attorneys withdrawing based on the defendant's threats. The court carefully considered the attorney's and defendant's positions before agreeing with the attorney and allowing him to remain in the case. There is no evidence tending to show that the attorney failed to represent the defendant in an objectively reasonable manner. *See Strickland v. Washington*, 466 U.S. 668, 668-69 (1984).

After becoming dissatisfied with each of his previous attorneys, the defendant manufactured a basis for withdrawal by threatening to harm or kill them and their families. This Court should not reward such behavior by granting his requested relief. Doing so would instead create a perverse incentive for defendants seeking to game the counsel-appointment process or to otherwise undermine the proceedings against them by issuing similar threats against their attorneys. *Cf. United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993) (rejecting failure-to-withdraw claim partly to avoid "invit[ing] criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial").

**VII.  The defendant's within-guidelines sentence is substantively reasonable.**

The defendant's final claim is that his 210-month within-guidelines sentence "was longer than necessary to achieve the goals of [18 U.S.C.] § 3553." Def. Br. 54. This Court "review[s] the substantive reasonableness of a sentencing decision for abuse of discretion," and "[i]n so doing, [is] obliged to apply a presumption of reasonableness to a sentence within or below a properly calculated guidelines range." *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017) (internal quotation marks omitted). The "presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." *Id.*

The defendant offers no persuasive reason why his sentence was unreasonable, particularly when the district court sustained two of his three objections, reducing his offense level by four points and his guidelines range by 94 months, and denied the government's motion for an upward departure or variance. And he attempts to limit the nature and circumstances of the offense to "a single count for the firearm charge." Def. Br. 54. This was anything but a garden-variety felon-in-possession case.

The defendant highlights the challenges he has faced in his life. Def. Br. 44. But the sentencing court considered those facts and did not abuse its discretion in failing to accord them as much weight as the defendant would like. JA1500-JA1503; *see United States v. Susi*, 674 F.3d 278, 290 (4th Cir. 2012) ("That the court did not

agree with Susi as to the value, or relative weight, to give each factor and thus did not sentence Susi to as low a sentence as he desired does not in itself demonstrate an abuse of the court's discretion."); *United States v. Barronette*, 46 F.4th 177, 208 (4th Cir. 2022) (rejecting similar argument concerning sentencing court's consideration of mitigating difficult-childhood evidence). Finally, the fact that the defendant repeats the same arguments on appeal as he did in the district court itself demonstrates he cannot show an abuse of discretion. *See United States v. Jeffery*, 631 F.3d 669, 679-80 (4th Cir. 2011).

This Court should affirm the defendant's sentence.

## Conclusion

For the reasons appearing above, the Court should affirm the defendant's conviction and sentence.

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____/s/_____
William B. Jackson
Joseph E. Depadilla
Assistant United States Attorneys

**Statement Regarding Oral Argument**

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,988 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/
_____

William B. Jackson
Assistant United States Attorney

## Certificate of Service

I certify that on September 30, 2022, I filed electronically the foregoing brief with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel of record.


By: _____/s/_____

William B. Jackson
Assistant United States Attorney
Eastern District of Virginia
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
(757) 441-6331
william.jackson3@usdoj.gov